## UNITED STATES *v.* CENTRAL PAC. R. Co.

*(Circuit Court, D. California.  January 29, 1886.)*

1. **PUBLIC LANDS—GRANT TO CALIFORNIA & OREGON RAILROAD—MEXICAN GRANT.**
    Under the act of congress of July 25, 1866, lands outside of the 40-mile limit of the grant, and within the exterior limits of a Mexican grant, are subject to selection, instead of alternate odd sections not otherwise disposed of at the time of the location of the road, situated within the 40-mile limit, any time after the rejection of the Mexican grant.

2. **SAME—LIEU LANDS.**
    Such grant does not attach to the odd sections outside of the 40-mile limit until the selection is actually made by the railroad company, under the direction of the secretary, in lieu of other lands disposed of within the limit.

3. **SAME—PREMATURE SELECTION—SUIT TO VACATE PATENT.**
    Where such lands have been prematurely selected and patented, a suit by the United States to vacate the selection and patent on the ground of mistake, commenced after the rejection of the grant, will not be sustained when no private party has acquired an interest in the land, and the United States has assumed no obligation or suffered no injury.

4. **SAME—BOUNDARIES OF GRANT.**
    Where three exterior boundaries of a Mexican grant are designated, and the quantity of land known, the fourth boundary may be ascertained by running a line parallel, to the opposite boundary, a proper distance therefrom to embrace the quantity of land called for.

In Equity.

*S. G. Hilborn,* for complainant.

*Bennett & Wigginton,* for respondent.

SAWYER, J.  This is a suit on the part of the United States to vacate three patents, alleged to have been improperly issued, by mistake, to respondent, for lands, under the congressional grant to the California & Oregon Railroad Company, to aid in the construction of a railroad under the act of July 25, 1866. 14 St. 239. The patents cover, in the aggregate, something over 20,000 acres. It is alleged that, at the time the grant attached by the definite location of the

road, the lands were within the exterior limits of a Mexican grant, a claim for confirmation of which was then pending and undetermined in the courts; and, being *sub judice*, they were not public lands, and therefore not within the terms of the grant. The dates of the patents, respectively, are March 5, 1872, March 17, 1875, and December 20, 1875. The plat of definite location provided for under the act was filed on July 1, 1867. The alleged Mexican grant to Dias was presented for confirmation, August 31, 1852, and rejected by the board of land commissioners, as invalid, October 30, 1854. The district court affirmed the decision rejecting the grant, March 15, 1858. On July 1, 1857, the claim was again rejected by the circuit court, and the decree of the circuit court was affirmed on appeal, and the grant finally rejected by the United States supreme court, March 3, 1873. The grant, therefore, never had the approval of any one of the four tribunals through which it passed, and the original decree of 1854, rejecting it, was affirmed by each; showing that there never was any merit in the claim under the alleged grant.

It thus appears that the first patent sought to be vacated was issued before the final rejection of the grant; and the other two, more than two years, and two years and nine months, respectively, after its final rejection. It is insisted, on the part of the complainant, that the grant attached to the specific lands on the filing of the map of definite location, in 1867, before the final rejection of the Mexican grant, and that the lands being then *sub judice*, they were not public lands, and not within the terms of the grant, as held in regard to the Moquelemos grant in *Newhall* v. *Sanger*, 92 U. S. 761. But these lands occupy a position entirely different from those involved in that case, and are not within that decision. None of these lands are within the 40-mile limit of the grant, to the specific odd sections of which the grant, by virtue of the act, *ipso facto* attaches by the filing of the plat of definite location. The act grants "*every alternate section* of public land, not mineral, designated by *odd numbers*," to the number of 10 on each side of the road, or within a limit of 40 miles, or 20 miles on each side, and then provides that "when any of said alternate sections, or parts of sections, shall be found to have been *granted, sold*, reserved, occupied by homestead settlers, pre-empted, or *otherwise disposed of, other lands*, designated as aforesaid, *shall be selected by said companies in lieu* thereof, under *the direction* of the secretary of the interior, in alternate sections, designated by odd numbers as aforesaid, nearest to, and not more than 10 miles *beyond, the limits of said first-named alternate sections;*" that is to say, within 10 miles outside of the 40-mile limit. The grant, in such cases, does not attach to the specific sections of outside lands on the filing of the plat, but it remains a mere "*float*" until it is ascertained that there is a deficiency within the limits of the specific grant, and until the selections outside are in fact made under the direction of the secretary of the interior.

The grant does not attach to the specific alternate sections of lieu lands, until the selection is so made by the company which has the right of selection, and recognized and adopted by the secretary. If, at the time the selection is so made, recognized, and adopted, the lands have ceased to be *sub judice*, and are subject to grant, the rights of the company vest, and are valid. This point is settled in the case of *Ryan* v. *Central Pac. R. Co.*, arising under the same grant to the Oregon & California Railroad Company, and affected in precisely the same way by the claim under the same alleged Mexican grant to Dias, (5 Sawy. 260,) affirmed on appeal by the United States supreme court, (99 U. S. 383;) also affirmed in *St. Paul, etc., R. R.* v. *Winona R. R.*, 112 U. S. 731; S. C. 5 Sup. Ct. Rep. 334; see, also, *Grinnell* v. *Railroad Co.*, 103 U. S. 739; *Cedar Rapids R. Co.* v. *Herring*, 110 U. S. 27; S. C. 3 Sup. Ct. Rep. 485; *Kansas P. R. Co.* v. *Atchison, T. & S. F. R. Co.*, 112 U. S. 414; S. C. 5 Sup. Ct. Rep. 208. The land involved in that case was embraced in one of these very patents,—that of March 17, 1875,—and the case is therefore decisive on the identical question now presented. Both the circuit and supreme courts distinguished that case from *Newhall* v. *Sanger*, on the principle hereinbefore stated. The lands covered by the last two patents set out in the bill are situated precisely as the lands in *Ryan's Case* were, under the same grants and judicial proceeding. They are all lieu lands, situate outside the 40-mile limit, and required to be selected before the congressional grant attached. The lands were selected and patented after the rejection of the Dias grant, and after they had ceased to be *sub judice*. The title is therefore perfect as to the lands covered by the two patents issued in 1875, as is settled by the cases cited. The patents were therefore properly issued, and as to those two patents the bill must be dismissed.

The only difficulty I have in the case relates to the first patent issued in 1872, before the final rejection of the claim under the Dias grant, and while the lands so selected and patented were still *sub judice*, and *for that reason only*, at the time, not subject to selection under the decision of *Newhall* v. *Sanger*. The lands embraced in this patent were also all lieu lands, situated outside the 40-mile limit of the specific grant. They are therefore in an entirely different position from those inside the 40-mile limit. Those inside the 40-mile limit, under the decision of *Newhall* v. *Sanger*, being *sub judice* at the time the grant attached to the specific odd sections, were not within the terms of the grant at all, but were regarded, in a certain sense, as otherwise disposed of, and the subsequent removal of the cloud over them did not bring them within the grant; but being reserved, or so otherwise disposed of as to prevent the attaching of the congressional grant, congress provided for supplying the deficiency, not out of these same lands after the claim should be rejected, but out of other outside lands that should be open to grant when the selection should be made. Congress intended that the company should have

its 10 sections of land to a mile of the road, and provided that the lands outside might be selected in lieu of those already appropriated inside. In *Ryan's Case*, the supreme court held that the deficiency may be made up by selections made outside, at any time after any lands covered by a pending claim are released from that claim,—after they cease to be *sub judice*, and become, in every sense, public lands, open to other disposition. Now, the only difficulty in regard to this patent is that the selection and patent were *premature*. Had the company waited till after the rejection of the Dias claim before selecting, the selection and patent of identically the same lands would have been good. If this selection and patent fail, the defendant has not yet received all the lands to which it is entitled, and it is still entitled to select an equal amount of outside lands, within the prescribed limits, provided a sufficient quantity of unappropriated lands is left for the purpose. It does not appear that anybody else has acquired any interest in these lands patented, and since they are patented it is not probable that any adverse interest in them has been acquired. If this patent should be vacated, therefore, being no longer *sub judice*, the defendant would *now* be entitled to select these identical lands to compensate for the loss, and receive another patent for them. The Dias grant having long since been finally rejected, the lands would be now open for selection, in pursuance of the decision in *Ryan's Case*. The result might be only the substitution of another patent to the same lands for the one vacated, at a great deal of further trouble and expense, both to the United States and to the respondent.

The very defense to this suit, brought long after the final rejection of the grant, and the claim now set up to the lands under these patents, is a manifestation now of an intent to select those lands. Morally and legally, the defendant is, at this time, clearly entitled to have these identical lands, there being no adverse claims to them. There is really no equity shown now in favor of the government; on the contrary, the equities are all in favor of the defendant. The government has realized all the benefits to be derived from the construction of the road. It made the same innocent mistake, if mistake there was, made by the defendant, whereby the defendant may lose a part of its lands, and treated these lands as subject to grant, and, having done so, it has presumably received double the ordinary price for the alternate even sections; so that it has in fact given away nothing and lost nothing. It has received all it ever would have received had the grant not been made, and the road either not been built or been built. The government is not, and it never would have been, entitled to anything more. Whereas, on the other hand, the defendant, in case of the vacation of the patent, has not got its full consideration,—has not got all the land to which it is entitled, and which the government is bound to give,—and it is now entitled to select the very same lands should the patent be vacated. In fact, the probability is that all the other lands have already been sold by the government,

and the purchase money received by it, so that there will at this time be no lands, except these, out of which the grant can be satisfied. It does not appear that the United States has assumed any obligation to any other persons with respect to these lands, or that they can in any way sustain any injury by the action already had, *merely prematurely* taken, or that anybody else has acquired any adverse interest or claim in the lands, or will in any way suffer by reason of these patents.

The vacation of this patent would involve the necessity of issuing another for the same or an equal amount of other lands, if any there be,—of substituting a new patent for the one vacated. Courts of equity will not do a vain thing,—will not sustain a bill where no injury results from a mere innocent error in fact or law, upon which it is based,—and especially where that error consists merely in doing a little earlier than it should be done a thing entirely proper to be done at the right time, and which, if now undone, must be done over again. "Courts of equity do not, any more than courts of law, sit for the purpose of enforcing moral obligations, or correcting unconscientious acts *which are followed by no loss or damage.*" 1 Story, Eq. Jur. 203. Much less will it interfere where no injury results, and there is only a mutual innocent mistake, there being no moral wrong, and where, to correct the mistake in favor of the party complaining, would be inequitable, and work an injury to the other party. Besides, if these lands are now lost, all others open to selection having at this day been disposed of, by reason of a change of circumstances the parties could not be placed *in statu quo.* 1 Story, Eq. Jur. 138*a*, 138*c*.

I think this patent is now within the principles established in *Ryan's Case.* On these grounds the bill, as to this patent also, should be dismissed.

A large portion of the lands—some 6,000 acres, I believe—covered by these patents, and indicated in the answer and evidence, were conveyed in fee-simple absolute, to various parties before the filing of this bill, and the defendant had, at the commencement of this suit, and it now has, no interest whatever in them. There is no party to the bill having any interest in these lands. No decree can be made affecting those lands without having the holders or somebody having an interest in them before the court. *U. S.* v. *Central Pac. R. Co.,* 8 Sawy. 81; S. C. 11 Fed. Rep. 449. The grantees of the patentee of these lands are indispensable parties to the suit. The bill must be dismissed, as to those lands, on this ground also.

So, also, the defendant has conveyed all of these lands, in trust, to secure the payment of ten millions of bonds issued and put upon the market. Although the respondent is interested in the *residuum* after paying the bonds, and is therefore a proper and doubtless a necessary party as to all the lands not absolutely conveyed, as before stated, there is no bondholder, trustee, or representative of the bond-

holders, made a party to the suit, and no decree can be made affecting their rights without their presence.

It is but just to observe, on behalf of the government, that this suit was commenced *after* the decision of *Newhall* v. *Sanger*, 92 U. S. 761, and *before* the decision in *Ryan* v. *Central Pac. R. Co.*, 99 U. S. 382, and in all probability without noticing the distinction established by the latter case, which takes this suit out of the rule laid down in the former. Had the latter case been decided before the commencement of this suit, it is but reasonable to presume that it never would have been instituted.

The answer *denies* that certain portions of the lands embraced in the first patent of 1871, and some embraced in the other patents, were within the exterior boundaries of the Dias grant, and alleges that they are wholly outside those boundaries. If this be so, those lands so situated are, in any event, properly patented to the defendant, and the title to them is perfect. Whether they are within the exterior boundaries of the Dias grant or not depends upon how those boundaries are located, and probably no two surveyors, if left to themselves, would have located them alike. Surveyor General Hardenburg located them in 1873, and Col. Von Schmidt again located them in 1880 under the direction and supervision of Surveyor General Wagner, and, I presume, expressly for the purposes of this suit, as I know of no other occasion for their determination; but these locations differ very widely. In my judgment, Wagner's location is much more accurate than Hardenburg's. Wagner's seems to have been located upon the principles stated and approved by Mr. Justice FIELD in *Henshaw* v. *Bissell*, 18 Wall. 255, decided after Hardenburg's location was made. Says Mr. Justice FIELD:

"With the breadth of the tract stated, the quantity limited, the southern and eastern lines designated, all the elements are given essential to the complete identification of the land. A grant of land thus identified, or having *such descriptive* features as to render its identification a matter of absolute certainty, entitled the grantee to the specific tract named." Id. 253.

I think, upon the principle thus stated, we have the elements from which the exterior boundaries of the Dias grant can be ascertained with reasonable certainty. It is described in his petition, and the annexed *desino*, which was an unusually good one. We find from these documents that his grant was "joining to the north with Mr. Larkin's farm; to the south with the plains, also vacant; to the east with lands already selected; and to the west by the mountains,—and the quantity was 11 square leagues." Turning to the *desino* we find it platted in a parallelogram, as bounded on the north by Larkin's land, beyond which we cannot go; on the east, by Jimeno's grant; on the south, by a line drawn at right angles to the westward from Jimeno's west line, on the south of which line the lands, for a distance of many miles, appear to be vacant. The mountains are

sketched to the west. Thus we have all the elements for locating the grant with proximate and reasonable precision,—Larkin's line on the north, Jimeno's on the east, the mountains on the west, and the quantity. Taking these given boundaries, and the fourth can only be drawn just far enough south to take in, with the other three boundaries, 11 square leagues of land. On any other principle there would be no certainty whatever, for the south line might just as well be drawn fifty miles further south as five. This appears to me to be the only reasonable way of determining the exterior boundaries of the Dias grant, and I adopt it. It seems to have the approval of the United States supreme court, and this seems to be the theory of Surveyor General Wagner's survey in 1880, and the boundaries so located to have his approval. Upon this location of the exterior boundaries of the grant, a considerable portion of the land in the oldest patent issued, as well as in the others, lies entirely outside of the exterior boundaries of the grant, and they were *public lands, not sub judice,* at the time of the selection and patent, and were then subject to be taken by the railroad grant, and were rightfully patented. On this ground, also, the bill must be dismissed as to all the lands embraced in the several patents which lie north of the south line of Larkin's *rancho,* and all lying south of a line drawn from the Jimeno ranch westward to the mountains, far enough south of Larkin's line to embrace 11 square leagues of land.

The bill must be dismissed on the several grounds indicated, and it is so ordered.