## NEWHALL v. SANGER.

1. The act of July 1, 1862 (12 Stat. 492), grants to the Western Pacific Railroad Company every alternate section of public land designated by odd numbers within the limits of ten miles on each side of its road, not sold, reserved, or otherwise disposed of by the United States, and to which a homestead or pre-emption claim may not have attached at the time the line of the road is definitely fixed. The act of 1864 (13 Stat. 358) enlarges those limits, and declares that the grant by it, or the act to which it is an amendment, "shall not defeat or impair any pre-emption, homestead, swamp-land, or other lawful claim, nor include any government reservation or ·mineral lands, or the improvements of any *bona fide* settler." *Held*, that lands within the boundaries of an alleged Mexican or Spanish grant, which was *sub judice* at the time the Secretary of the Interior ordered a withdrawal of lands along the route of the road, are not embraced by the grant to the company.

2. The words "public lands" are used in our legislation to describe such lands as are subject to sale or other disposition under general laws.

3. The fiction of law, that a term consists of but one day, cannot be invoked to antedate the judicial rejection of a claim, so as to render operative a grant which would otherwise be without effect.

APPEAL from the Circuit Court of the United States for the District of California.

Submitted on printed arguments by *Mr. Montgomery Blair* for the appellant, and by *Mr. George F. Edmunds* for the appellee.

MR. JUSTICE DAVIS delivered the opinion of · the court.

The object of this suit is to determine the ownership of a quarter-section of land in California. The appellee, who was the complainant, claims through the Western Pacific Railroad Company, to whom a patent was issued in 1870, in professed compliance with the requirements of the acts of Congress commonly known as the Pacific Railroad Acts. The appellant derives title by mesne conveyances from one Ransom Dayton, the holder of a patent of a later date, which recites that the land was within the exterior limits of a Mexican grant called Moquelamos, and that a patent had, by mistake, been issued to the company. The court below decreed that the appellee was the owner in fee-simple of the disputed premises; and that the junior patent, so far as it related to them, should be cancelled.

The act of July 1, 1862 (12 Stat. 492), grants to certain

railroad companies, of which the Western Pacific, by subsequent legislation, became one, every alternate section of public land designated by odd numbers, within ten miles of each side of their respective roads, not sold, reserved, or otherwise disposed of by the United States, and to which a homestead or pre-emption claim may not have attached at the time the line of the road is definitely fixed. It requires that, within a prescribed time, a map designating the general route of each road shall be filed in the Department of the Interior, and that the Secretary thereof shall then cause the lands within a certain distance from such route to be withdrawn from pre-emption, private entry, and sale. The precise date when the Western Pacific Company filed its map is not stated in the record; but we infer that it was between the first day of the December Term (1864) of this court and the thirteenth day of February, 1865. At all events, the withdrawal for this road was made on the 31st of January, 1865; and our records show that the Moquelamos grant, which had been regularly presented to the commissioners, under the act of March 3, 1851, and duly prosecuted by appeal, was rejected here Feb. 13, 1865. It is a conceded fact, that the lands embraced by it fall within the limits of the railroad grant, which were enlarged by the amendatory act of 1864 (13 Stat. p. 358). This act also declares that any lands granted by it, or the act to which it is an amendment, " shall not defeat or impair any pre-emption, homestead, swamp-land, or other lawful claim, nor include any government reservation or mineral lands, or the improvements of any *bona fide* settler."

There can be no doubt that, by the withdrawal, the grant took effect upon such odd-numbered sections of public lands within the specified limits as were not excluded from its operation; and the question arises, whether lands within the boundaries of an alleged Mexican or Spanish grant, which was then *sub judice*, are public within the meaning of the acts of Congress under which the patent, whereon the appellee's title rests, was issued to the railroad company.

The subject of grants of land to aid in constructing works of internal improvement was fully considered at the present term, in *Leavenworth, Lawrence, and Galveston Railroad Company* v. *United States, supra*, p. 733. We held that they did not embrace

tracts reserved by competent authority for any purpose or in any manner, although no exception of them was made in the grants themselves; and we confined a grant of every alternate section of "land" to such whereto the complete title was absolutely vested in the United States. The acts which govern this case are more explicit, and leave less room for construction. The words "public lands" are habitually used in our legislation to describe such as are subject to sale or other disposal under general laws. That they were so employed in this instance is evident from the fact, that to them alone could the order withdrawing lands from pre-emption, private entry, and sale, apply.

The *status* of lands included in a Spanish or Mexican claim, pending before the tribunals charged with the duty of adjudicating it, must be determined by the condition of things which existed in California at the time it was ceded, and by our subsequent legislation. The rights of private property, so far from having been impaired by the change of sovereignty and jurisdiction, were fully secured by the law of nations, as well as by treaty stipulation. It had been the practice of Mexico to grant large tracts to individuals, sometimes as a reward for meritorious public services, but generally with a view to invite emigration and promote the settlement of her vacant territory. The country, although sparsely populated, was dotted over with land claims. Exact information in regard to their extent and validity could hardly be obtained during the eager search for gold which prevailed soon after we acquired California. It was not until March 3, 1851, that our government created a commission to receive, examine, and determine them. As the operations of our land system, had it then been extended to California, would have produced the utmost confusion in titles to real estate within her limits, it was wisely withheld by Congress, until such claims should be disposed of. The act of that date declared that all lands, the claims to which should not have been presented within two years therefrom, should "be deemed, held, and considered to be a part of the public domain of the United States." This was notice to all the world that lands in California were held in reserve to afford a reasonable time to the claimant under an asserted Mexican or Spanish grant to maintain his rights before the

commission. He was not bound by its adverse decision; but was entitled to have it reviewed by the District Court, with a right of ultimate appeal to the Supreme Court. If he, however, neglected to take timely and proper steps to obtain such review, the decision was thereby rendered final and conclusive. The lands then fell into the category of public lands. The same remark will apply to the judgment of the District Court; but if he prosecuted his appeal to the tribunal of last resort, the reserved lands retained their original character in all the successive stages of the cause, and they were regarded as forming a part of our national domain only after the claim covering them had been "finally decided to be invalid."

A failure, therefore, to present the claim within the required time, or a rejection of it either by the commission or by the District Court, without seeking to obtain a review of their respective decisions, or by this court, rendered it unnecessary to further reserve the claimed lands from settlement and appropriation. They then became public in the just meaning of that term, and were subject to the disposing power of Congress.

It may be said that the whole of California was part of our domain, as we acquired it by treaty, and exercised dominion over it. The obvious answer to all inferences from this acknowledged fact, so far as they relate to this case, is, that the title to so much of the soil as was vested in individual proprietorship did not pass to the United States. It took the remaining lands subject to all the equitable rights of private property therein which existed at the time of the transfer. Claims, whether grounded upon an inchoate or a perfected title, were to be ascertained and adequately protected. This duty, enjoined by a sense of natural justice and by treaty obligations, could only be discharged by prohibiting intrusion upon the claimed lands until an opportunity was afforded the parties in interest for a judicial hearing and determination. It was to be expected that unfounded and fraudulent claims would be presented for confirmation. There was, in the opinion of Congress, no mode of separating them from those which were valid without investigation by a competent tribunal; and our legislation was so shaped that no title could be initiated under the laws of the United States to lands covered

by a Spanish or Mexican claim, until it was barred by lapse of time or rejected.

This is, in our opinion, the true interpretation of the act of 1851. Until recently, it governed the action of the Interior Department upon the advice of the law officers of the government (11 Op. Att'y-Gen. 493 ; 13 id. 388), and was, at least by implication, sanctioned by this court in *Frisbie* v. *Whitney*, 9 Wall. 187. No subsequent legislation conflicts with it. On the contrary, the excepting words in the sixth section of the act of March 3, 1853, introducing the land system into California (10 Stat. 246), clearly denote that lands such as these at the time of their withdrawal were not considered by Congress as in a condition to be acquired by individuals or granted to corporations. This section expressly excludes from pre-emption and sale all lands claimed under any foreign grant or title. It is said that this means "lawfully" claimed ; but there is no authority to import a word into a statute in order to change its meaning. Congress did not prejudge any claim to be unlawful, but submitted them all for adjudication. Besides the act of March 3, 1853, which authorized the settlement and purchase of the lands released by the operation of the law of 1851, there was a general law (id. 244) passed on the same day, which conferred upon a settler on lands theretofore reserved on account of claims under foreign grants, then or thereafter declared by the Supreme Court to be invalid, the rights granted by the pre-emption law, after the lands should have been released from reservation, — a class of lands which, from an early day, it had been the policy to reserve until the adjustment of all such claims. See act of 1811, 2 Stat., pp. 664, 665, sects. 6, 10. This provision clearly implies that no right of pre-emption previously attached to lands of that description by reason of settlement and cultivation.

It is unnecessary to dwell longer upon this question, or to review subsequent statutes touching the government lands in California. It suffices to say, that there is nothing in any of them which weakens the construction we have given to the act of 1851. This controversy depends upon that act and the Pacific Railroad acts which we have cited.

The appellee invokes the doctrine, that judgments of a court

during a term are, by relation, considered as having been rendered on the first day thereof. There is a fiction of law that a term consists of but one day; but such a fiction is tolerated by the courts only for the purposes of justice. *Gibson* v. *Chouteau*, 13 Wall. 92. To antedate the judicial rejection of a claim, so as to render operative a grant which would be otherwise without effect, does not promote the ends of justice, and cannot be sanctioned.

As the premises in controversy were not public lands, either at the date of the grant or of their withdrawal, it follows that they did not pass to the railroad company.

*Decree reversed, and cause remanded with directions to dismiss the bill.*

MR. JUSTICE FIELD, with whom concurred MR. JUSTICE STRONG, dissenting.

I am not able to agree with the majority of the court in this case. The only exception made by Congress from its grant to the Western Pacific Railroad Company consisted of lands within certain limits, which, at the time the line of the road was definitely fixed, had been "sold, reserved, or otherwise disposed of by the United States," or to which a pre-emption or homestead claim had then attached. The exception was intended to keep the public lands open to settlement and sale until the line of the road was established. I cannot understand how the presentation of a fraudulent claim to any portion of the lands within the limits designated, founded upon an invalid or forged Mexican grant, could change their character as public lands, or impair the title of the company, or have any other effect than to subject the company to the annoyance and expense of exposing and defeating the claim. Nor can I perceive the bearing upon the case of the act of March 3, 1853, "to extend pre-emption rights to certain lands therein mentioned;" for that act applies only to pre-emption rights, and by its terms is limited to lands *previously* reserved.

I think the judgment of the court below should be affirmed.