UNITED STATES *v.* CENTRAL PACIFIC R. Co.

*(Circuit Court, D. California.* April 17, 1882.)

1. PATENT FOR LAND—VACATING—INDISPENSABLE PARTIES.

The owners of the land, in a suit to vacate a patent, are indispensable parties to the bill, and when the patentee has conveyed the land a bill against him will be dismissed for want of necessary parties.

2. MEXICAN GRANT—WITHIN EXTERIOR BOUNDARIES.

Where a claim was filed for confirmation of a Mexican grant of 11 leagues, within exterior boundaries containing three times that quantity of land, and the surveyor general, in extending the public surveys, found the grant within the sphere of his operations, and surveyed it in advance of confirmation, in pursuance of the statute of 1852, (10 St. at Large 90,) reserving nearly double the quantity necessary to satisfy the grant, and the survey was acquiesced in by the claimant, the land surveyed into sections, platted, and returned to the land-office the surplus as public lands, which surplus was thereafter treated as public lands by the government, opened to pre-emption, offered for public sale by proclamation of the president, and afterwards opened to private entry and homesteads, patents being issued therefor for all such purposes, and to satisfy a congressional grant to the Central Pacific Railroad Company, *it seems* that such surplus will be regarded as emancipated from the claim of the Mexican grant, and that the patents issued therefor in the usual course of business of the land-office will be regarded as valid.

3. EX PARTE SURVEY.

An *ex parte* survey of the exterior boundaries of a rejected Mexican grant, made by direction of the commissioner of the land-office, after the lands embraced in the supposed grant have been officially surveyed and disposed of as public lands, is not admissible as evidence on the part of the government in a suit to vacate a patent.

In Equity.

*Wayne McVeagh,* Atty. Gen., and *Philip Teare,* U. S. Atty., for complainant.

*Tully R. Wise,* for defendant.

SAWYER, C. J. This is a bill in equity to vacate and annul five several patents issued by the United States to the defendant, under the act of congress granting land to aid in the construction of the Central Pacific Railroad, for something over 14,000 acres of land in the aggregate, on the ground that the patents were issued by mistake for lands not embraced in the grant by congress.

The patents respectively bear date April 9, 1870, April 3, 1872, February 28, 1874, November 23, 1875, and June 6, 1879. The lands are all odd sections, and lie within the limits of the grant designated in the act of congress. On September 22, 1852, Andreas Pico presented to the board of land commissioners for settling titles to

v.11,no.5—29

lands in California, in pursuance of the act of congress of March 3, 1851, a petition for a confirmation of a claim to a grant of a tract of land embracing 11 square leagues, called "Moquelamos." The description in the grant, as set out in the petition, is as follows: "Eleven square leagues on the river Moquelumne, bordering upon the north upon the southern shore of said river; on the east upon the adjacent ridge of mountains; on the south upon the land of Mr. Gulnac; and upon the west upon the estuaries of the shore." There was no *diseno* accompanying the grant. The grant to Gulnac, referred to as the southern boundary, was surveyed in February and March, 1858, and the location became final by dismissal of the appeal in February, 1862, before the congressional grant to the railroad company by congress. Thus, at the time of the congressional grant, the northern, western, and southern exterior boundaries of the Moquelamos grant were fixed and certain, and the only point of uncertainty is the location of the eastern exterior boundary—"the adjacent ridge of mountains"—and its proper location would depend upon where the ridge is situated, and what points of the ridge are to be taken for the line. The range line of the public surveys, between ranges 7 and 8, crosses the tract of land now claimed by the complainant to be within the exterior boundaries of the Moquelamos grant, on such a line as leaves about 90,000 acres to the west of said range line, and about 60,000 acres to the east, making about 150,000 acres in the whole. The said range line, between ranges 7 and 8, lies further east than any point in the easternmost line of the lands of Mr. Gulnac—the Rancho el Campo de las Franceses—as finally located, and the final location corresponds very well with the *diseno* of the grant filed in the case. So that, between the said range line on the east, the lands of Mr. Gulnac, as granted and located, on the south, the estuaries of the shore on the west, and the Moquelumne river on the north, there are about 90,000 acres of land, or about 40,000 acres more than enough to satisfy the grant—11 square leagues, containing 48,825 and a fraction acres—or nearly double the amount called for by the grant. To the east of said range line, between ranges 7 and 8, there are about 60,000 acres claimed by complainant to be within the exterior boundaries of the Moquelamos grant, bounded on the north by the Moquelumne and on the south by the Calaveras rivers; but no part of it is bounded by Mr. Gulnac's land, either as finally located, or as shown on the *diseno* to the grant—said Gulnac's land all lying to the westward of said range line. About two-thirds of the lands now in question lie in that portion of the assumed Moquelamos grant which is east of said

range line, between ranges 7 and 8, and about one-third to the west of said range line.

In 1852 and 1853, the township lines were run by the United States surveyor general, laying off all these lands within the boundaries of the Moquelamos grant, as claimed, into townships. In 1855 the section lines were run, and plats of the surveys filed in the proper land-office, for all lands lying east of said range line, between ranges 7 and 8. From the time of the survey and filing of the plats, these lands, east of said range line, were treated as all other surveyed public lands by the United States land-office, and all government offices having anything to do with them; and pre-emption claims, and, after the passage of the homestead laws, homesteads, were recognized, proved up, allowed, and patented. In February,— on the fifteenth and sixteenth of February, 1859,—upon public proclamation made by the president of the United States, these lands were offered at public sale at the land-office at Stockton, and some sold and patented; and, after such public sale, the lands were open for private entry, to any parties desiring to purchase in the same manner as all other surveyed public lands are open to entry, after having been offered at public sale in pursuance of proclamation by the president, and many of them were so entered. In September, 1864, Messrs. Stanley & Hayes, attorneys for the claimant in the case pending in the United States courts, for confirmation of the Moquelamos grant, addressed a communication, bearing date September 22, 1864, to the surveyor general of the United States for the state of California, notifying him that the case was pending on appeal to the United States supreme court; that the land claimed lay on the Moquelamos river, and "includes and covers the land embraced in township (2) two north, ranges five, six, and seven east, Mount Diablo meridian; also township (3) three north, ranges five, six, and seven east, Mount Diablo meridian; also township (4) four north, range 6 east, Mount Diablo meridian; part of township south of Moquelumne river; also township (4) four north, range seven east, Mount Diablo meridian; part of township south of Moquelumne river; also township (4) four north, range five east, Mount Diablo meridian; part of township south of Moquelumne river."

They further notified the surveyor general that the lands thus described were "not subject to entry or pre-emption," and requested him to suspend all proceedings in regard to pre-emption of "*said lands, or any part thereof, until the final determination of the claim.*"

*On the notice* is indorsed, "Suspended September 21, 1864,"—one day earlier than the date of the notice. One of the dates is doubtless erroneous. On the same day the said surveyor general addressed to S. F. Nye, register of the land-office at Stockton, a communication, bearing date September 21, 1864, informing him that the "townships and plats of townships, including the lands described in the notice and request of Messrs. Stanley & Hayes, giving the same description as that contained in the notice, were "suspended to await the final determination of the boundaries of the Rancho Moquelamos, now pending before the United States district court." The claim to the grant was finally rejected by the United States supreme court as fraudulent, February 13, 1865; and thereupon the surveyor general, on November 21, 1865, revoked said suspension. All of the lands described in said notice and request by Stanley & Hayes, in regard to which the surveys and plats were suspended, lie to the west of said range line, between said ranges 7 and 8, and within and constitute the 90,000 acres lying west of that line. Thus it appears that the attorneys of the claimant themselves limited their claim to lands lying west of said range line, between ranges 7 and 8, and only looked to those lands to satisfy this grant in case of a confirmation. There is no evidence that there was any other action on the part of the government, or any of its officers, reserving said lands or suspending action with reference to pre-emptions, homesteads, sale, or entry of them, or any part thereof, from the time of their survey in 1852 and 1855, down to the date of the withdrawal in consequence of filing the plat of the location of the Central Pacific Railroad, January 31, 1865, which was only 13 days before the final rejection of the Moquelamos grant, after it had been pending for about 13 years. With reference to the land lying east of the range line, between ranges 7 and 8, the certificate of Otis Perrin, receiver, and George A. McKenzie, register, of the Stockton land-office, is as follows: " We do hereby certify that the records of this office show that no land was ever withdrawn or reserved for the ' Moquelamos grant claim,' east of the line dividing ranges seven (7) and eight (8) east of Mount Diablo meridian." Thus it appears affirmatively, by the uncontradicted evidence, that prior to the issuing of the patents in question no action of any kind was ever taken by the government, or any of its officers, to reserve any portion of this land east of said range line for the satisfaction of the Moquelamos grant, or for any other purpose except to satisfy the railroad

grant in question.   On the contrary, these lands were townshiped in 1852, sectionized in 1855, thenceforth opened to pre-emption till February, 1859, when they were offered for public sale, and some of them sold at Stockton in pursuance of the proclamation of the president of the United States, and thereafter held open for homesteads, pre-emption, and private entry, like all other public lands of the United States.   There is no legal evidence in the case that the eastern exterior boundary of the grant, or the "adjacent range of the mountains," is in fact east of the said range line, between ranges 7 and 8.   All the evidence indicates that the Gulnac claim never extended east of that line, and there is nearly double the amount necessary to satisfy the Moquelamos grant west of that line, that is, in fact, bounded on the south by the Gulnac grant.   The evidence claimed by complainant to be admissible to show the location of the "adjacent ridge of mountains," and the eastern exterior boundary of the Moquelamos grant, is a certified copy of a plat of a survey and location of that line filed in the office of the surveyor-general of California, June 3, 1879, made in pursuance of the directions of the commissioner of the general land-office, bearing date February 18, 1879.   This proceeding is subsequent to the issue of these patents, and wholly *ex parte.*   The Moquelamos grant had been rejected as fraudulent 14 years before, and all the lands affected by the survey had been surveyed into sections, and in all respects dealt with and treated as public lands by all departments of the government for about 24 years.   Nearly all, if not quite all, had actually been patented by the United States to somebody.   The statute authorizes the location of confirmed grants, but I know of none authorizing the location of rejected grants for any purpose, and especially for the location of the exterior boundaries of rejected Mexican grants many years after the rejection, embracing three times the amount of land called for by the grant.   The lands were already officially surveyed, and all, or nearly all, disposed of.   The main purpose would seem to have been to make evidence for this contemplated case.   Certainly, the United States land-office can no more properly thus make legal testimony *ex parte* against its grantees to defeat grants already made in contemplated suits, than any other grantor.

The answer alleges, and the uncontradicted testimony also establishes the fact, that all the lands included in the patents in question were conveyed by the Central Pacific Railroad Company to *bona fide* purchasers before the filing of this bill.   And it also appears that a

very large portion, if not all the lands were also conveyed by the grantees of the defendant to various parties, so that now the lands are in the hands of numerous purchasers, many of them holding in small parcels. At the commencement of this suit, therefore, the Central Pacific Railroad Company, defendant, did not own an acre of the land in question, and it had no interest whatever in this controversy.

In 1876 the supreme court decided the case of *Newhall* v. *Sanger*, 92 U. S. 761, in which it was held that the odd sections within the *exterior* boundaries of the alleged Mexican grant called Moquelamos, the claim for confirmation of which had not been finally determined at the time of the withdrawal of the lands by the secretary of the interior in January, 1865, for the Central Pacific Railroad Company, were not "public lands" within the meaning of the act of congress granting lands to that corporation, and were, therefore, not included in that grant,—a majority of the justices taking a different view of that question from that taken, and still confidently entertained, by me, and reversing the judgment of this court on that ground. That decision settles the law upon that point, so far as this court is concerned, and is controlling in all cases to which it is fairly applicable, and it is probably applicable to all those lands embraced in the patents now in question lying west of the range line between ranges 7 and 8. I think, however, that it ought not to be held applicable to those lands situated to the east of said range line. The description of the Moquelamos grant is not very definite as to its eastern boundary. There is no *diseno* to make it definite. The quantity is limited to 11 square leagues, and its southern boundary is the land of Mr. Gulnac; and the eastern exterior boundary, as claimed by complainant, would carry it some nine or ten miles east of the eastern boundary of Gulnac's claim, while there is nearly twice as much land west of the range line between ranges 7 and 8, which has, in fact, Gulnac's land for a southern boundary, as is necessary to satisfy the grant. Besides, the government of the United States surveyed the lands east of said range line as public lands, and in all its departments treated them in all respects like other surveyed public lands, opening them to pre-emption, offering them for public sale upon proclamation by the president, and afterwards to private entry and for homesteads, and actually patented all, or nearly all, which had gone into second and still other hands before this bill was filed, and reserved an ample amount within the undisputed exterior boundaries for the satisfaction of the grant.

The appropriation act of August 31, 1852, appears to authorize proceedings restricting the location to smaller limits than the exterior boundaries, and surveying the surplus as public lands. The provision of the statute is: "For surveying private claims in California which may have been presented in good faith to the board of land commissioners, $22,500, provided, that the authority hereby conferred on the surveyor general shall apply only to such *unconfirmed* cases as, in the gradual extension of the lines of the public surveys, he shall find *within the immediate sphere of his operations*, and which he is satisfied ought to be respected, and actually surveyed *in advance of confirmation.*"

In this case there was a claim for the unconfirmed Moquelamos grant pending before the board of land commissioners, which, "*in the gradual extension of the lines of the public surveys*," the surveyor general *seems to have found* "*within the immediate sphere of his operations, and which he was satisfied ought to be respected and actually surveyed in advance of confirmation.*" He accordingly surveyed it, leaving an ample quantity of by far the best and most valuable portions of the land west of the range line mentioned to more than satisfy the grant, sectionizing and platting the surplus—being that part situate to the east of said range line—as "public lands," subject to be treated as other public lands, and returning the surveys and plats to the proper land-office. This proceeding seems to have been authorized by the provision of the statute cited, and to have emancipated that portion of the land lying to the east of the range line, between ranges 7 and 8, from any further claim under the Moquelamos grant. If that be the effect, then, there can be no question that these lands, at least, were subject to, and embraced in, the congressional grant to the Central Pacific Railroad Company.

The claimant of the grant himself, also, as we have seen, by his counsel, limited his claim to the lands so reserved for the purpose lying west of the said range line, so that all parties in interest acquiesced in limiting the eastern exterior boundary of the land out of which the grant was to be satisfied to the said range line. Certainly, if the doctrine of estoppel applies to any case as against the United States, it ought to be made applicable here, where all parties, including the claimant himself, for so many years acquiesced in accepting said range line as the eastern exterior boundary of the land within which the grant was to be located. Besides, as before suggested, there is no sufficient legal evidence, as against the defendant, that the eastern exterior boundary is, in fact, east of that line. But

conceding this recent *ex parte* survey to be legal evidence, it surely is not entitled to greater weight than the strictly official survey of 1855, executed under the express authority of the statute of 1852 cited, by which the eastern boundary of the tract out of which the grant was to be satisfied, was located at the range line, between ranges 7 and 8, and which was ever afterwards, till after issue of these patents, acted upon by the government, the claimant himself, and the people at large, as properly located.

Upon the facts disclosed in this case, it seems hardly consistent with good faith on the part of the United States, and scarcely worthy a great nation, at this late date, and after these lands have passed into the hands of numerous citizens as purchasers, to seek to vacate the patents upon which their titles rest. To many of these lands, especially to the west of the range line mentioned, a second patent has already been issued by the United States, and some of the occupants, it is generally understood, as a means of security from further annoyance, have acquired the title under both patents.

The reservation of the lands by which they were taken out of the railroad grant is not made in express terms by the statute itself, but it is worked out by construction from implications as to the policy of the government, drawn from other statutes relating to other objects, containing express reservations as to those particular objects, which to my mind are not very apparent, and are wholly unsatisfactory; and which did not command the assent of all the justices of the supreme court who sat in the case. Down to the decision in *Newhall* v. *Sanger*, the United States courts for the district of California, and the supreme court of the state,—and they may be reasonably supposed to have been somewhat familiar with the condition of these matters,—held the lands in question to be within the congressional grant. *Sanger* v. *Sargent*, U. S. C. C. in pamphlet, decided in September, 1874, and other cases in that court; *C. P. R. Co.* v. *Yolland*, 49 Cal. 439, and other cases. So, also, some of the justices of the United States supreme court itself, including the justice from this circuit, took the same view; and the executive department of the national government had early adopted and for many years prior thereto acted upon that hypothesis. Even under the decisions of the supreme court, had the withdrawal for the railroad occurred two weeks later, the congressional grant, under the law as it is, would have taken effect upon these lands. *Ryan* v. *C. P. R. Co.* 5 Sawy. 261, affirmed; 99 U. S. 382. Yet the only difference in the condition of the lands and the laws, as they were on the twelfth and four-

teenth of February, is that on the intermediate day the baleful shadow of an overhanging fraud had been floated away by a final rejection of the Moquelamos grant. On the twelfth of February these lands *were not*, and on the fourteenth they *were, "public lands,"* within the meaning of the act of congress. Yet there had been no change in the title in the mean time. The rejection of the fraudulent claim only determined judicially where the title was. It simply adjudged that the claim was not valid, and consequently that the lands claimed then were, and that they always had been, a part of the public domain. There was no reservation for any other purpose than to ascertain whether they belonged to the United States or to private parties, and there was no necessity for a reservation for that purpose. Had the claim been confirmed it would have taken sufficient land to satisfy the grant, whether reserved or not, as it would then have been adjudged to belong to the grantee and not to the United States. The act of congress only granted, and only purported to grant, lands that belonged to the United States, not those owned by private parties.

These observations are not made by way of criticism upon, or to question the propriety of, the decision of the supreme court, to which I yield implicit obedience, but to point the suggestions made respecting the consideration due from the government to the parties holding titles under the patents now in question.

Accepting the decision of the supreme court as correct, still considering these facts, and the action of the government itself upon the opposite construction for a long term of years,—more than 20 years,—the people who purchased are excusable if they supposed these patents carried a good title. They ought, certainly, to be entitled to some consideration at the hands of the government. And even as to the lands west of the said range line, the government, as well as the courts, state and national, from the date of the rejection of the Moquelamos grant till the case of *Newhall* v. *Sanger*,—a period of 10 years,—took the view and acted upon it, that the odd sections were embraced in the railroad grant; otherwise, there would have been no occasion for this, or other suits, to vacate the patents issued in pursuance of that view.

But however the case may be on the merits, under the decision of *Newhall* v. *Sanger*, as to the lands lying east of the range line, between ranges 7 and 8, there is another point upon which the present bill must be dismissed, as to all the lands and patents in question. The Central Pacific Railroad Company is the only defendant, and before

the filing of the bill it had conveyed all the lands in question and ceased to have any interest in the subject-matter in controversy. Not a person who had any interest in the matters in controversy when the bill was filed has been made a party to this suit. The court is asked to vacate patents to large quantities of land held by numerous parties under these patents without anybody having an interest in the lands being a party to the suit. The parties in interest are not only proper but indispensable parties. No decree can be rendered annulling or affecting the title of parties to land without their presence. They are entitled to their day in court. *Shields* v. *Barrow*, 17 How. 130; *Coiron* v. *Millandon*, 19 How. 113; *Barney* v. *Baltimore City*, 6 Wall. 285; *Ribon* v. *Railroad Co.* 16 Wall. 450; *Railroad Co.* v. *Orr*, 18 Wall. 475. The defendant in this suit, having no interest in the subject-matter involved, is not even a necessary, if a proper, party to the bill to annul the patents. To vacate the patents on this bill would be very much like foreclosing a mortgage upon lands, in a suit against a mortgagor not personally liable for the debt secured, after he has conveyed the mortgaged lands, without making the owner of the lands a party. All the indispensable parties are omitted from the bill, and those not necessary to be made parties are sued.

The bill must be dismissed on this ground, if on no other, and it is so ordered.