CARR *v.* QUIGLEY.

ERROR TO THE SUPREME COURT OF THE STATE OF CALIFORNIA.

Argued April 26, 27, 1893. —Decided May 15, 1893.

Lands within the exterior limits of a Mexican grant, *sub judice* at the date of
the definite location of the Central Pacific within that location, and not
required to satisfy the quantity granted by Mexico as determined by the
United States, were not reserved, but inured to the road as a portion of
its land grant and were properly patented to it as such.

*Newhall* v. *Sanger*, 92 U. S. 761, explained. *United States* v. *McLaughlin*,
127 U. S. 428, approved.

THIS was an action of ejectment brought by W. B. Carr
against John Quigley for the possession of one hundred and
sixty acres of land situated in the county of Alameda, State of
California. The land is a portion of an unnumbered odd
section granted to the Central Pacific Railroad Company of
California by the act of Congress of July 1, 1862, as amended
by the act of July 2, 1864, and which, by the consolidation of
the Western Pacific Railroad Company with the Central
Pacific Railroad Company, under the laws of California, in
June, 1870, inured to the latter company, and to it a patent
of the United States for the land mentioned was issued bearing
date on the 17th day of May, 1874.

The plaintiff claimed title to the demanded premises under a
conveyance to him by the Central Pacific Railroad Company
on the 10th day of June, 1871.

The complaint alleges that the plaintiff was the owner in
fee and entitled to the possession of the premises on the 22d
of December, 1877, and that on that day the defendant, with-
out right or title, against the will of the plaintiff, entered upon
the premises and ejected the plaintiff therefrom, and has ever
since withheld the possession from him, to his damage of one
thousand dollars; and that the value of the annual rent of the
premises is three hundred and twenty dollars. He therefore
prays judgment for the restitution of the premises, for the
damages sustained, and for the rents and profits.

The defendant in his amended answer, in addition to a general denial of the allegations of the complaint, sets up 1st, that at the date of the patent to the railroad company the land patented was not subject to the disposal of Congress, but was land reserved to answer the calls for land of a grant from the Mexican government to José Noriega and Robert Livermore, bearing date the 10th of April, 1839, and that by reason of such reservation the patent was issued without authority of law, and consequently was void; that, since October, 1877, the defendant has been in rightful possession of the land as a preëmptor under the laws of the United States; and, 2d, that the land was not sold by the grantee, the railroad company, within three years after the completion of its road.

A demurrer to this last defence was sustained by the court and its ruling was acquiesced in.

It was agreed that the annual value of the rents and profits of the land was fifty dollars.

The case was tried twice. On the first trial in the District Court of Alameda County, the plaintiff put in evidence the patent of the United States of the land to the Central Pacific railroad, and a conveyance of the same by that company to the plaintiff. The defendant then offered to prove that the land was within the exterior boundaries of the Mexican grant mentioned, and, therefore, reserved from the Congressional grant to the railroad company. The plaintiff objected to the offered proof on the ground that the land was not subject to preëmption when the defendant entered upon it, the patent of the United States having been previously issued, which was conclusive in an action of ejectment. The objection was sustained, to which the defendant excepted, and judgment was rendered for the plaintiff. Thereupon an appeal was taken by the defendant to the Supreme Court of California, and in January, 1881, the judgment was reversed, and the cause remanded for a new trial. In April, 1883, the case again came on for trial in the Superior Court of Alameda County, the successor to the District Court of that county, under the new constitution of California, which went into operation on the 1st of January, 1880. On that trial the evidence offered

by the defendant, which was excluded on the previous trial, was admitted, and new testimony given bearing upon the question of the reservation of the land in controversy. The defendant obtained a judgment, the court holding that the land was claimed as a part of the Mexican grant mentioned, and was reserved for its satisfaction. A motion for a new trial was denied. An appeal was then taken from the order denying the motion, and also from the judgment, to the Supreme Court of the State, which affirmed both the order denying a new trial and the judgment for the defendant; and for a review of the judgment the case was brought here on writ of error.

*Mr. A. B. Browne,* (with whom were *Mr. A. T. Britton* and *Mr. F. H. Waterman* on the brief,) for plaintiff in error.

*Mr. Michael Mullany* for defendant in error.

MR. JUSTICE FIELD, after stating the case, delivered the opinion of the court.

The defence upon which the defendant below relied on both trials, was that the land patented to the railroad company was within the boundaries of a Mexican grant, the validity of which was at the time under consideration by the Federal tribunals and was, therefore, reserved from sale when the patent was issued. Evidence to establish this fact was offered on the first trial, but rejected by the court, and for this alleged error the judgment recovered by the plaintiff was reversed.

On the second trial the evidence rejected on the first trial was received, and it was shown that the land patented to the railroad company was within the exterior bounds of the Mexican grant, and that its validity was then under consideration by the tribunals of the United States; and the court held that it was, for that reason, reserved from sale and that the patent therefor was unauthorized and void. The defendant having taken up a preëmption claim on the land, judgment was rendered in his favor.

The Supreme Court of the State sustained this view of the reservation of the land from sale and consequent appropriation to the satisfaction of the Congressional grant to the railroad company. The question for our determination is whether, at the time of the issue of the patent, the land was thus reserved.

The act of July 1, 1862, 12 Stat. 489, c. 120, provided for the incorporation of the Union Pacific Railroad Company, and made a grant of land to that company to aid in the construction of a railroad and telegraph line from the Missouri River to the Pacific Ocean. Its provisions apply in terms to that company, but the construction of other railroads is included within the objects contemplated by the act, and the clauses relating to the Union Pacific Railroad Company are made applicable to them. The ninth section authorizes the Central Pacific Railroad Company, a corporation of California, to construct a railroad and telegraph line from the Pacific Coast, at or near San Francisco, or the navigable waters of the Sacramento River, to the eastern boundary of the State, upon the same terms and conditions which were provided for the construction of the railroad and telegraph line of the Union Pacific. A similar grant of land, of the same extent and upon like conditions, was made to the Central Pacific, and the rights and obligations of the company were determined by the same law.

By the provisions of the third section, thus applied, there was granted to that company, to aid in the construction of its road and telegraph line, every alternate section of public land, designated by odd numbers, to the amount of five alternate sections per mile on each side of its road on the line thereof and within the limits of ten miles on each side "not sold, reserved, or otherwise disposed of by the United States, and to which a preëmption or homestead claim may not have attached at the time the line of the road is definitely fixed:" *Provided,* That all mineral lands were excepted from the operation of the act, but where they contained timber, that timber was granted to the company.

By the fourth section of the act, as amended by section six of the act of 1864, it was provided: "That whenever said

company shall have completed not less than *twenty* consecutive miles of any portion of said railroad and telegraph line, ready for the service contemplated by this act, and supplied with all necessary drains, culverts, viaducts, crossings, sidings, bridges, turnouts, watering places, depots, equipments, furniture, and all other appurtenances of a first-class railroad, the rails and all the other iron used in the construction and equipment of said road to be American manufacture of the best quality, the President of the United States shall appoint three commissioners to examine the same and report to him in relation thereto; and if it shall appear to him that not less than *twenty* consecutive miles of said railroad and telegraph line have been completed and equipped in all respects as required by this act, then, upon certificate of said commissioners to that effect, patents shall issue conveying the right and title to said lands to said company, on each side of the road as far as the same is completed, to the amount aforesaid; and patents shall in like manner issue as each *twenty* miles of said railroad and telegraph line are completed, upon certificate of said commissioners."

The definite location of the road was fixed in January, 1865, and the road was completed in all respects as required by the act of Congress and accepted by the President prior to the 1st of June, 1869. The Mexican grant to José Noriega and Robert Livermore was known by the name of "Las Pocitas," and as confirmed was described and bounded as follows, viz.: On the north by the Lomas de las Cuevas, on the east by the Sierra de Buenos Ayres, on the south, by the dividing line of the establishment of San José, and on the west by the rancho of Don José Dolores Pacheco, containing in all two square leagues, a little more or less. The confirmation was of that quantity if contained within the boundaries named; and if less than that quantity was found to be contained therein, then the confirmation was for the less quantity, and for all of the described tract.

The grantees in February, 1852, petitioned the board of land commissioners, created by the act of Congress of March 3, 1851, for a confirmation of the grant, and in February,

1854, it was confirmed with the description and condition mentioned.

On appeal the decree was affirmed by the United States District Court for the Northern District of California in February, 1859, to the same extent and for the same quantity and under the same condition. On appeal the decree of the District Court was affirmed by the Supreme Court of the United States in January, 1861, and its mandate was filed in the District Court in February, 1865, upon which an order was entered in that court that the claimants, the grantees named, have leave to proceed upon the decree of the District Court as a final decree.

Two official surveys were made of the land confirmed, one in 1865 by the deputy United States surveyor-general of the district. This survey, as appears on the maps, embraced within the exterior boundaries nearly ten square leagues. It was disapproved by the Secretary of the Interior, because it embraced more than two square leagues, and he directed that a new survey be made. A new survey was accordingly made, which was approved by the surveyor-general and the Commissioner of the Land Office, and, on the 6th of June, 1871, by the Secretary of the Interior. On the 20th of August, 1872, a patent of the United States for the land, the survey of which was thus approved, was issued to the grantees. The land in controversy in this case is not included in the land thus surveyed and patented.

In *Newhall* v. *Sanger*, 92 U. S. 761, it was held that land within the boundaries of a Mexican grant, while proceedings were pending in the tribunals of the United States to determine its validity, was exempt from sale and preëmption, and, therefore, of appropriation under the land grant acts of the United States in aid of the construction of railroads and telegraph lines. Those acts declared that the sections of land granted were to be of public lands of the United States, and by public lands were meant lands of the United States which were open for sale and preëmption; and that of these public lands there should be excepted such portions as had been sold or reserved from sale or otherwise disposed of by the United

States, or to which a preëmption or homestead right had attached at the time of the definite location of the roads.

For some years after the decision in *Newhall* v. *Sanger* it was supposed that the reservation from such appropriation was extended to all lands within the outboundaries of a Mexican grant without reference to the actual quantity granted. The interpretation given to the term " boundaries " used in the opinion in that case led to this conclusion.

But the case of *United States* v. *McLaughlin*, 127 U. S. 428, where it was attempted to extend the reservation from sale to lands nearly one hundred miles square upon the ground that that amount was within the exterior boundaries designated, although the amount intended to be granted was only eleven leagues, led to a consideration of the facts in *Newhall* v. *Sanger*, and to a better understanding of the import of its decision. It then appeared that there was no allegation in the pleadings of that case that the boundaries of the grant designated exceeded the actual amount intended to be granted. As appeared by them, it was a grant of a specific quantity within boundaries which embraced no greater amount. The language used with reference to the exemption of a grant of that character evidently presented a different question from that of a grant with boundaries embracing an area exceeding many times the quantity actually granted. So in *United States* v. *McLaughlin*, the court considered the different kinds of grants of the Mexican government, which were: 1, grants by specific boundaries, where the donee was entitled to the whole tract; 2, grants of quantity, as of one or more leagues within a larger tract described by what was called outboundaries, where the donee was entitled to the quantity specified, and no more; 3, grants of a certain place or rancho by name, where the donee was entitled to the whole tract, according to the boundaries given, or, if not given, according to its extent as shown by previous possession. In the second class, where the grant was of quantity within boundaries embracing a much larger quantity, the grant was a float, to be located by the action of the government before it could attach to any specific tract, like the land warrants, as the court said, of the United States.

The grant in the McLaughlin case was a float, and, according to the different interpretations of the outside boundaries, the region embraced within them was fifty square leagués in the one case and over eighty in the other, and the court pertinently asked whether such an extensive region could be under an interdict, as reserved land, absolutely exempt from disposition even by Congress, during the whole period covered by the litigation respecting the validity of the grant, which, if found valid, was only for the quantity of eleven square leagues.

In that particular case the grant was found to be a wretched fraud, but the court said: "Laying all this aside, however, and looking at the claim as one fairly *sub judice*, we may repeat our question, whether it can be possible that so great a region of country was to be regarded as reserved from alienation for so small a cause — an ordinary eleven-league grant."

The grant of eleven square leagues out of a country seventy or eighty miles in length, and from six to ten in width, containing over eighty square leagues, was, upon the theory of reservation advanced, deemed to have the effect of retiring from the supposed public domain the whole eighty leagues and more for a period of years, no one could state how long.

The court did not consider that this view of the reservation intended was reasonable, and observed that it was at the "option of the government, not of the grantee, to locate the quantity granted; and, of course, a grant by the government of any part of the territory contained within the outside limits of the grant only reduces by so much the area within which the original grantee's proper quantity may be located. If the government," added the court, "has the right to say where it shall be located, it certainly has the right to say where it shall not be located; and if it sells land to a third person at a place within the general territory of the original grant, it is equivalent to saying that the quantity due to the original grantee is not to be located there. In other words, if the territory comprehended in the outside limits and bounds of a Mexican grant contains eighty leagues, and the quantity granted is only ten leagues, the government may dispose of seventy leagues without doing any wrong to the original grantee." It ob-

served, it is true, that it was the practice in administering the public lands to allow the original grantee to make his own selection of the place where he will have the quantity located, provided it could be located in one tract, but that was a matter of favor and not of right.

In illustrating the serious, if not absurd, results which would follow from a different view, the court referred to the grant made by the Mexican government to President Yturbide in 1822 of twenty leagues square, or four hundred square leagues of land, to be located in Texas.   In 1835 the Mexican Congress authorized his heirs to locate the land in New Mexico or in Upper or Lower California.   In 1841 it was decreed that it should be located in Upper California — that is, the present State of California.   And the claim was actually presented to the board of land commissioners and appealed to the District Court, and thence to the Supreme Court.   So, observed the court, "according to the contention of the complainant in the present case, all California was interdicted territory during the pendency of that claim before the board and in the courts." "We can well understand," the court added, "that Indian reservations and reservations for military and other public purposes of the government should be considered as absolutely reserved and withdrawn from that portion of the public lands which are disposable to purchasers and settlers, for, in those cases, the use to which they are devoted, and for which they are deemed to be reserved, extends to every foot of the reservation. The same reason applies to Mexican grants of specific tracts, such as a grant for all the land within certain definite boundaries named, or all the land comprised in a certain rancho or estate.   But this reason does not apply to grants of a certain quantity of land, within a territory named or described, containing a much larger area than the amount granted, and where, as in the present case, the right of location within the larger territory is in the government, and not in the grantee. In such case, the use does not attach to the whole territory, but only to a part of it, and to such part as the government chooses to designate, provided the requisite quantity be appropriated."

So the court held that where a Mexican grant was for a. specific quantity within an area containing a much larger quantity it was only the quantity actually granted which was reserved from disposition by the government during the examination of the validity of the grant ; the remainder was at its disposal as a part of the public domain. And in considering *Newhall* v. *Sanger* the court said that "the opinion in that case took no notice of the fact (which did not appear in the record) that the grant was one of that class in which the quantity granted was but a small part of the territory embraced within the boundaries named. It proceeded throughout as it would have done on the supposition that the grant covered and filled up the whole territory described. It simply dealt with and affirmed the general proposition that a Mexican grant, while under judicial investigation, was not public land open for disposal and sale, but was reserved territory within the meaning of the law — a proposition not seriously disputed."

So, in the present case, there was only reserved from sale and appropriation by the government within the exterior boundaries of the Mexican grant to José Noriega and Robert Livermore so much land as would satisfy the quantity actually granted to them, which was two leagues, and it was competent for the government to grant the remainder of the land within the exterior boundaries to whomsoever it might choose. It was land open to sale by the government and could have been appropriated to the railroad company ; and its patent to that company passed the land.

The Supreme Court of California acted upon the theory that the exemption from sale extended to all lands within the exterior boundaries of the grant instead of merely to the amount specifically granted, but as we have shown this was an erroneous view to be taken of the case after the decision of *United States* v. *McLaughlin.* And *Doolan* v. *Carr*, 125 U. S., at page 632, recognizes the doctrine of that decision. If, therefore, the Mexican grant in this case was valid, and it has been so adjudged, there was reserved from sale only two leagues to be selected under the direction and control of the

government out of any lands within those boundaries. It was for the government itself to prescribe the limits from which the quantity granted by the Mexican government should be selected, and having reserved sufficient from the exterior boundaries to satisfy that amount it was perfectly competent for it to grant any surplus remaining; and it appears from the actual survey of the specific quantity granted by Mexico that the Congressional grant to the railroad company was outside of any of the land thus appropriated.

It follows that the judgment of the Supreme Court must be

*Reversed and the cause remanded for further proceedings in accordance with the views expressed in this opinion.*