### UNITED STATES v. OREGON & C. R. CO. et al.

#### (Circuit Court, D. Oregon.    September 9, 1895.)

#### No. 1,982.

1. PUBLIC LANDS—EXCLUSION FROM GRANT.
    It is not necessary, in order to exclude lands from the operation of a grant by congress in aid of a railroad company, that title to such lands should have passed to another company, but it is sufficient if such lands have been in any way segregated from the public domain, so as to indicate an intention to exclude them from the grant.

2. SAME.
    By an act of July 2, 1864, congress granted lands to the N. P. R. Co., in aid of the construction of a line whose general location was defined in the act.    In 1865 the N. P. Co. filed a map of general location, which was rejected by the land office because wrongly supposed to be not sufficiently definite; and in 1870 the company filed another map, which was accepted, and the lands indicated by it withdrawn from entry.    *Held* that, by the grant to the N. P. Co., the land within the limits where its road, as defined by the act and by the maps, might possibly be definitely located, was so far segregated from the public domain as to be excluded from a subsequent grant to another company.    Carr v. Quigley, 13 Sup. Ct. 961, 149 U. S. 652, distinguished.

John M. Gearin and George H. Williams, for the United States.
W. D. Fenton and L. E. Payson, for defendants.

GILBERT, Circuit Judge. . By this suit the United States seek to cancel certain patents issued to the Oregon & California Railroad Company of lands within the state of Oregon claimed by said company to have been earned under the terms of the act of congress of July 25, 1866, granting it lands to aid in the construction of a line of railroad beginning at Portland, in the state of Oregon, and running thence south to the southern boundary of the state.    It is alleged in the bill that the same lands had been granted to the Northern Pacific Railroad Company in the grant to that company of July 2, 1864, and hence were not within the purview of the later grant. The cause was first heard upon a demurrer to the bill, and many of the questions involved in the suit were at that time considered and disposed of.    U. S. v. Oregon & C. R. Co., 57 Fed. 890.    The case now comes on to be heard upon the issues thereafter made by the answer of the defendant corporation, and the proofs which were thereupon taken.

It is shown that the map filed by the Northern Pacific Railroad Company on the 13th day of August, 1870, and which, upon the decision of the demurrer, was assumed to be a map of definite location, was not such, but was a map of the general route of the line

of that company's road. Upon that fact, so established by the proof, and not disputed by the complainant, it is now urged by the defendants that the land in controversy in this suit passed to the Oregon & California Railroad Company, by virtue of its grant. Its contention is that the lands never were taken from the public domain by the grant to the Northern Pacific Railroad Company, for the reason that the title never passed to that company, and that such title could never pass until there was a definite location of the road; that by the act of definitely locating the line the grantee of the railroad lands selects the granted lands from the mass of public lands among which it has the right to choose, and designates those to which the title passes, and that, without such definite location of line and consequent selection of lands, no title is vested; that, notwithstanding the settled doctrine of the decisions that the grant is in præsenti, it is nevertheless not in præsenti, as to any particular lands, until, by the act of the grantee, it is made certain what lands are to be taken. It is proven that there was never a definite location of the branch line of the Northern Pacific Railroad. The lands in controversy in this suit lie within the place limits of a line of road such as that indicated by the maps of general route of 1865 and 1870. The decision of the case on final hearing must therefore depend upon the effect of the language of the act granting land in aid of the branch line, and the filing of the preliminary maps of that line.

It is unnecessary here to repeat the language of the grant, further than to say that it was a grant of public lands, and that it authorized the company to build and operate a continuous road, beginning at Lake Superior, and running thence westerly to some point on Puget Sound, "with a branch line via the valley of the Columbia river to a point at or near Portland, in the state of Oregon, leaving the main trunk line at the most suitable place, not more than 300 miles from its western terminus." There can be no doubt that if, by the terms of the act, the line of the branch road had been definitely fixed as running upon a certain line, or upon a straight line between two designated points, the title would have passed from the date of the grant and its acceptance by the grantee, for there would be no need of further or more definite location. The description of the branch line, as contained in the act, does not, it is true, fix its point of beginning or ending, nor definitely determine the location of any portion thereof. It is evident, however, that the valley of the Columbia river, for a large portion of the route which would necessarily be covered by such a branch line, is so narrow that the road must have followed either the north or the south bank of the river; and it will not be disputed that a road built in compliance with the terms of the grant, and on the line therein defined, would have been confined to a narrow strip of territory. By both the map of 1865 and the map of 1870 it follows the north bank of the river. The company had the right to choose either bank, but it never exercised that right by making a definite location of the road. Were the lands, therefore, under the terms of the act, granted lands, and hence not public lands, from the date of the grant, and

were they on that account excluded from the subsequent grant to the defendant corporation? It is not necessary that the title should have passed to the Northern Pacific Railroad Company, in order that the lands should be placed in such attitude to the public domain as to be excluded from a subsequent grant in aid of another railroad. It is enough if they were in any way segregated from the public lands, so that at the date of the junior grant it will be presumed to have been the intention of congress to exclude them from its operation. I hold that it was such segregation to set apart a larger area within which the lands granted to the Northern Pacific Company were to be selected by it. It was sufficient if the lands in controversy in this suit were subject to the contingency of being within the place limits of the branch line whenever that line should receive its definite location. Said the court in Bardon v. Northern Pac. R. Co., 145 U. S. 538, 12 Sup. Ct. 856:

"By 'public land' * * * is meant such land as is open to sale or other disposition under the general laws. All land to which any claims or rights of others have attached does not fall within the designation of 'public lands.'"

In Wilcox v. Jackson, 13 Pet. 513, it was said that:

"Whensoever a tract of land shall have once been legally appropriated to any purpose, from that moment the land thus appropriated becomes severed from the mass of public lands, and that no subsequent law or proclamation or sale would be construed to embrace it, or to operate upon it, although no reservation were made of it."

If the Northern Pacific branch road had been located on any possible line within the terms of the act, so as to go by way of the Columbia river valley to a point at or near Portland, the greater portion, at least, of the lands in controversy would necessarily have fallen within its place limits. It is clear that congress did not intend that the grant to the Northern Pacific Company should be abridged or impaired by the subsequent grant to the Oregon & California Company, nor that any portion of the subsidy to the latter company should depend upon the contingency of the failure of the former company to definitely locate its line of road. Nor did it intend to give to the latter company lands that had been set apart for the former,—lands within which the Northern Pacific Company had the right to earn the subsidy given it by the act.

The defendants rely upon the case of Carr v. Quigley, 149 U. S. 652, 13 Sup. Ct. 961, to sustain their contention that the whole tract from which the branch-line grant could be satisfied was not set apart from the public lands by the granting act, so as to be without the scope of the subsequent grant to the Oregon & California Railroad Company. In that case the court applied and affirmed the doctrine of Newhall v. Sanger, 92 U. S. 761, in which it was held that a grant to a railroad company of lands not sold, reserved, or otherwise disposed of by the United States, and to which a homestead or pre-emption claim may not have attached at the time the line of the road was definitely fixed, and providing that such grant shall not defeat or impair any pre-emption, homestead, swamp land, or other lawful claim, nor include any government reservation or mineral lands, or the improvements

of any bona fide settler, did not include lands within the boundary of an alleged Mexican or Spanish grant, which was sub judice at the time the secretary of the interior ordered a withdrawal of the lands along the route of the road; that lands within such boundaries of such alleged grant, being thus under consideration in the courts, are not public lands, within the meaning of the acts of congress in making grants to aid the construction of works of internal improvement. In U. S. v. McLaughlin, 127 U. S. 449, 8 Sup. Ct. 1177, the court had under consideration the conflicting rights of the Central Pacific Railroad Company of California, under a grant similar to that of the Northern Pacific Railroad Company in this case, and the grantees under a Mexican grant of a certain quantity of land, to be located within the limits of a larger area. It was held that the fact that the Mexican grant was sub judice at the time of the grant to the railroad company did not exclude the whole of the larger area, from which it was to be taken, from the operation of the railroad grant; but the controlling reason of the decision was declared to be the fact that the right to locate the smaller area within the greater was not vested in the donee of the grant, but remained in the United States, and the further fact that, notwithstanding the grant to aid the railroad company, there still remained within the described area sufficient land to meet the demands of the grant. The court said:

"It is in the option of the government, not of the grantee, to locate the quantity granted; and, of course, a grant by the government of any part of the territory contained within the outside limits of the grant only reduces by so much the area within which the original grantee's proper quantity may be located. If the government has the right to say where it shall be located, it certainly has the right to say where it shall not be located; and, if it sells land to a third person at a place within the general territory of the original grant, it is equivalent to saying that the quantity due to the original grantee is not to be located there. In other words, if the territory comprehended in the outside limits and bounds of a Mexican grant contains 80 leagues, and the quantity granted is only 10 leagues, the government may dispose of 70 leagues without doing any wrong to the original grantee."

In Carr v. Quigley the same question was again considered by the court, and the doctrine of U. S. v. McLaughlin was expressly approved.

It is contended that the implied doctrine of those decisions is that the rule there announced applies likewise to cases where the right of selection is vested, not in the United States, but in the railroad company. Such is not perceived to be their meaning. It is, rather, the distinct doctrine of those cases that it was only because the United States had the right to make the selection of the granted quantity of land within the larger area called for in the Mexican grant that a portion of the described tract was held to be subject to the subsequent grant of the railroad company, and that otherwise the court would have considered the whole tract, so set apart and subjected to the right of the grantee, excluded from the public lands, and not included within the grant of lands in aid of works of internal improvement. The inference is that if the right of selection had been vested in the grantee of the Mexican grant the

whole tract would have remained subject to his right, and therefore not subject to a subsequent grant, so long as the first right existed. A defined tract of land, out of which a smaller area has been granted, the location of which is to be made by the grantor, is in a widely-different condition, so far as concerns the grantor's right, from a tract in which the right to select the granted portion is vested in the grantee. In the former case a subsequent grant to another of a portion of the described area is only an exercise of the grantor's right of selection. It is his declaration that the portion so subsequently bestowed by him upon another has been eliminated from the described tract, and has been taken from the lands out of which the first grant is to be satisfied. In the case of the Mexican grants this power of selection remained in the United States. Its exercise in no way contradicted or subverted the terms of the grant, or abridged the rights of the grantee thereunder. It is not so in the case of railroad land grants, such as those under consideration in this case. The United States had not the right to locate the lands granted to aid the Northern Pacific Railroad Company. The grant to that company carried to the grantee the right to make selection of the granted lands. It might definitely locate its line in good faith, in compliance with the requirement of the act, and by such location select and acquire the lands within the place limits upon both sides of its line. It is unimportant that the company never exercised this power. The right was established by the act, and it still subsisted when congress, by a later grant, bestowed lands in aid of the construction of the Oregon & California Railroad.

But at the date of the grant to the Oregon & California Railroad Company the lands in controversy herein were not only affected by the fact of the prior grant to aid the branch line of the Northern Pacific road, but that company had upon March 6, 1865, filed in the general land office its map of the general route of its road, and had thereupon asked for a withdrawal of the granted lands within the prescribed area upon both sides of its line. The map so filed, known as the "Perham Map," was not satisfactory to the commissioner of the general land office, and he notified the company that it was disapproved—First, because it did not show the exact location, "indicating by flagstaffs the progress of the survey," nor the "precise portions of each section or smallest legal subdivision cut by the road"; and, second, because it was not filed in the district land offices as well as in the general land office. These were not valid objections. It has never been held that the map of general route must show a line definitely located upon the ground with all the accuracy of a final survey. It has been considered sufficient if "its general course and direction are determined after an actual examination of the country, or from a knowledge of it, and it is designated by a line on the map showing the general features of the adjacent country, and the places through or by which it will pass." Buttz v. Railroad Co., 119 U. S. 55, 7 Sup. Ct. 100. It would have been impossible at that time to have made a map of the branch line, such as was required by the commissioner. The court will take knowledge of the fact that at that date a large portion of the public lands on the line of the road was unsurveyed. By the Perham map the position of the

branch line is indicated with reference to the Columbia river. By the scale of the map, its distance from that river at any point is approximately ascertainable. If a withdrawal of the granted lands within the place limits upon both sides of the general route so selected had been ordered by the commissioner of the general land office, there can be no doubt that the effect of such action would have been to segregate the withdrawal lands from the public lands subject to disposal by subsequent grant, and would have operated to reserve them therefrom. Were the rights of the company affected by the fact that the commissioner of the general land office erroneously found the map unsatisfactory for the reasons above stated, and notified the company of his disapproval? The supreme court has held that:

"When the general route of the road is thus fixed, in good faith, and information thereof given to the land department by filing a map thereof with the commissioner of the general land office or the secretary of the interior, the law withdraws from sale or pre-emption the odd sections, to the extent of 40 miles, on each side." Buttz v. Railroad Co., supra.

While it is true that in the case just cited there is no direct ruling upon the question of the power of the commissioner of the general land office, and the effect of his approval or rejection of a map, the clear import of the language of the opinion is that the commissioner is not clothed with power to affect the rights of the railroad company; and it would seem that upon the filing of a map which in fact complies with the law, and is filed in good faith, the law itself operates to withdraw the granted lands.

It is further urged that the Perham map was defective for reasons other than those stated by the commissioner of the general land office in his letter disapproving the same; that that portion of the line by way of the Columbia river valley does not end at a point "at or near Portland," but continues, in an unbroken line, to the waters of Puget Sound, and that it is not designated upon the map as a branch line; and that, so far as the map indicates, it appears to be a main line. The act gave authority, together with a right of way and a subsidy, to build a main line from Lake Superior to the waters of Puget Sound, and a branch line as heretofore indicated. In the map there is no designation of either line as the main line or the branch line. So far as the map locates the road west of the Rocky Mountains, it complies strictly with the terms of the act, with the exception that the line by the Columbia river valley, instead of ending at a point at or near Portland, proceeds further, and ends at the waters of Puget Sound. The fact that the construction of a road from Portland to Puget Sound was not authorized by the grant does not impair the validity of the location of that part of the road which was authorized, and which was located in compliance with its terms, and it is immaterial that the main line and the branch line are not so respectively designated upon the map. They are in the location called for by the language of the granting act, and it will be presumed that they are located in pursuance thereof. This map had been on file for more than a year when the grant to the Oregon & California Railroad was made, and it not only furnishes evidence of the location of

the general route of the line of the Northern Pacific branch line, and of the consequent segregation of those lands from the public lands by operation of law, but it was notice to the Oregon & California Railroad Company of the prior grant and the prior bestowal of these lands in aid of another road.

But if it is conceded that the map of 1865 was ineffective to accomplish the withdrawal of lands, and that its rejection by the commissioner of the land office is a conclusive adjudication of its insufficiency, the map of 1870 was open to no such objection. Upon its receipt in the land office the withdrawal of lands was made upon the records. No reason is seen why the map of general route which is required by the act, even if filed after the date of the junior grant, does not, so far as the junior grant is concerned, serve to sufficiently identify the lands covered by the prior grant. It is true that, after filing the map of general route of 1870, the Northern Pacific Company still possessed the right to change the line whensoever it should make its definite location thereof, and that it was required by the act to file such map of definite location for the purpose of finally indicating the lands that were to be patented to it. But until such final map was filed the map of general route, whereby the withdrawal was in fact accomplished, served to sufficiently identify the granted lands, notwithstanding the reserved right to alter its location. In the absence of such map of final location, and until the same is filed, it is a reasonable presumption that the granted lands are those which have been withdrawn in pursuance of the filing of the map of general route as required under the terms of the grant.

In any view of the case, I find no warrant for holding that it was the intention of congress to grant these lands to the Oregon & California Railroad Company. A decree will be entered for the United States, as prayed for in the bill.