UNITED STATES v. OREGON & C. R. CO. et al.

(Circuit Court, D. Oregon. September 8, 1893.)

No. 1,982.

1. PUBLIC LANDS—RAILROAD GRANT—NORTHERN PACIFIC—EXTENT OF GRANT.
　　Act of July 2, 1864, (13 Stat. 365,) which authorized the construction of the Northern Pacific Railroad from Lake Superior westerly to some point on Puget sound, with a branch via the valley of the Columbia river to a point at or near Portland, Or., granted lands in aid of the construction on each side of "said railroad line." *Held*, that the grant extended to the road with its branch, and not merely to the main trunk line.

2. SAME—RESERVATION OF "GRANTED" LANDS.
　　The grant to the Northern Pacific Railroad was of "every alternate section of public land, not reserved, sold, granted * * * at the time the line of road is definitely fixed and a plat thereof filed in the office of the commissioner of the general land office." *Held*, that the reservation of "granted" lands was not made in contemplation of a subsequent grant of the same lands to the Oregon & California Railroad.

3. SAME—GRANT IN PRÆSENTI.
　　The grant of land to the Northern Pacific Railroad conveyed a present title, subject to the right of the United States to re-enter on failure of the railroad to comply with conditions subsequent, and made the land so conveyed "granted" land, within the operation of the subsequent grant to the Oregon & California Railroad, which also reserved "granted" land.

4. SAME—PRIORITY OF GRANT.
　　The grant of lands to the Oregon & California Railroad did not gain a priority over the grant to the Northern Pacific Railroad, either by the fact that the Oregon & California Railroad filed its map of definite location, constructed a portion of its road, and received patents for the land, before the maps of the line of the Northern Pacific Railroad, showing the conflict of grants, were filed, or by the fact that no portion of the Northern Pacific was finally constructed on the line of such maps.

In Equity. Suit by the United States against the Oregon & California Railroad Company, John A. Hurlburt, and Thomas L. Evans to cancel patents, and restore land to the public domain. Defendants demur. Demurrer overruled.

Daniel R. Murphy and John M. Gearin, for the United States.
W. D. Fenton and L. E. Payson, for defendants.

GILBERT, Circuit Judge. By act of congress of July 25, 1866, a grant of lands was made to the Oregon & California Railroad Company to aid in the construction of a line of railroad within the state of Oregon, beginning at Portland, and running thence to the

southern boundary of the state; thence to connect with a proposed line of railroad in California running from the state line to a point of connection with the Central Pacific Railroad, in the Sacramento valley. The grant was made in the usual form, and covered every alternate section of public land, not mineral, designated by odd sections, to the amount of 10 sections per mile on either side of the line, reserving therefrom lands granted, sold, reserved, occupied by homestead settlers, pre-empted, or otherwise disposed of, for which lands, indemnity was to be allowed as provided in the act. Under the provisions of this act the beneficiary filed its map of definite location for a distance of 60 miles south of Portland on October 29, 1869, and upon January 31, 1870, the lands within the grant for that distance were by the secretary of the interior withdrawn from settlement. A portion of the road was thereupon constructed, and commissioners were appointed to examine and report thereon. On December 31, 1869, the commissioners reported that the road had been duly built for the first 20 miles south from Portland. On September 28, 1870, the commissioners reported the due construction of the next 20 miles. Both these reports were approved by the president, and patents for the lands coterminous with the completed road were issued to the Oregon & California Railroad Company, of dates May 9, 1871, July 12, 1871, June 22, 1876, and June 18, 1877.

The United States brings this suit to cancel said patents, and to restore said lands to the public domain, upon the ground that the lands were not within the grant to said railroad company, and said patents were erroneously issued. There is involved in the suit, approximately, 100,000 acres of patented lands, and 120,000 not patented. The merits of the controversy are presented upon a demurrer to the bill. It is the contention of the United States that the lands were the subject of a grant to the Northern Pacific Railroad Company prior in date to the grant to the Oregon & California Railroad Company, and that, therefore, they were not included in the grant to the latter company, but were, upon the other hand, expressly excluded therefrom by the words of reservation, whereby prior "granted" lands were taken out of the operation of the later grant.

On the 2d day of July, 1864, by act of congress, the Northern Pacific Railroad Company was incorporated. 13 Stat. 365. A portion of section 1 provides as follows:

"And said corporation is hereby authorized and empowered to lay out, locate, construct, furnish, maintain and enjoy a continuous railroad and telegraph line with the appurtenances namely, beginning at a point on Lake Superior in the state of Minnesota or Wisconsin; thence westerly by the most eligible railroad route as shall be determined by said company, within the territory of the United States, on a line north of the forty-fifth degree of latitude, to some point on Puget sound, with a branch via the valley of the Columbia river to a point at or near Portland in the state of Oregon, leaving the main trunk line at the most suitable place, not more than three hundred miles from its western terminus. Sec. 2. And be it further enacted that the right-of-way through the public lands be and the same is hereby granted to said Northern Pacific Railroad Company, its successors and assigns, for the construction of a railroad and telegraph as proposed; and the right, power and authority is hereby given to said corporation to take from the public lands

adjacent to the line of said road, material of earth, stone, timber, etc., for the construction thereof. Said way is granted to said railroad to the extent of two hundred feet in width on each side of said railroad, where it may pass through the public domain, including all the necessary ground for station buildings, workshops, depots, machine shops, switches, side tracks, turntables, and water stations, and the right-of-way shall be exempt from taxation within the territories of the United States. The United States shall extinguish as rapidly as may be consistent with public policy and the welfare of the said Indians, the Indian titles to all lands falling under the operation of this act, and acquired in the donation to the road named in this bill. Sec. 3. And be it further enacted, that there be and hereby is granted to the Northern Pacific Railroad Company, its successors and assigns, for the purpose of aiding in the construction of said railroad and telegraph line to the Pacific Coast and to secure a safe and speedy transportation of the mails, troops, munitions of war and public stores over the route of said line of railway every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile on each side of said railroad line as said company may adopt through the territories of the United States, and ten alternate sections of land per mile on each side of said railroad whenever it passes through any state, and whenever on the line thereof the United States have full title, not reserved, sold, granted or otherwise appropriated, and free from pre-emption or other claims or rights at the time the line of said road is definitely fixed, and a plat thereof filed in the office of the commissioner of the general land office; and whenever prior to said time any of said sections or parts of sections shall have been granted, sold, reserved, occupied by homestead settlers or pre-empted or otherwise disposed of, other lands shall be selected by said company in lieu thereof under the direction of the secretary of the interior in alternate sections, and designated by odd numbers, not more than ten miles beyond the limits of said alternate sections; provided that if said route shall be found upon the line of any other railroad route, to aid in the construction of which lands have been heretofore granted by the United States as far as the routes are upon the same general line, the amount of land heretofore granted shall be deducted from the amount granted by this act," etc.

Section 6 provides that the president of the United States shall cause the lands to be surveyed for 40 miles in width on both sides of the entire line of said road after the general route shall be fixed, and as fast as may be required by the construction of said railroad, etc.

The defendants raise a question of construction of this act, which, if well taken, disposes of the controversy at the outset. They urge that the grant is to be strictly construed against the grantees therein named, and that by the terms thereof land is granted only in aid of the construction of the main line of the Northern Pacific, and not in aid of the branch line by way of the Columbia River valley to Portland. I do not so construe the language of the grant. The act authorized the company to build and operate a continuous road, "beginning at Lake Superior and running thence westerly to some point on Puget sound, with a branch line via the Columbia River valley to Portland." It then granted to the company permission to take material for the construction of "said road" from the public lands adjacent thereto, and gave a right of way upon public lands 200 feet "on each side of said railroad." It granted lands in aid of the construction, and the grant extends to lands on each side of "said railroad line," and makes the further provision that as soon as the general route is fixed the president shall cause the granted lands to be surveyed for 40 miles on both sides of "the

entire line." Throughout the act the reference is to the road with its branch, as a single line or road. In the words of the act the grant of land is coextensive with the grant of right of way and the grant of other privileges. There is as much reason for confining the grant of way to the main trunk line as for confining the grant of subsidy to that portion of the road. The road with its branch is referred to as one road in the act, and we have no warrant for saying it is not properly so described.

In view of the subsequent action of the company, however, it becomes immaterial whether or not there was a grant in aid of the branch line. Under the terms of the act the company had the power to locate the main line by the valley of the Columbia river if it so chose, and, as will be seen, that route was subsequently selected, and maps were filed in accordance therewith, and, whatever rights the Northern Pacific Company acquired to the definite sections of land involved in this suit, it obtained by reason of so locating its main line. These lands being included in the general terms of the grant in aid of the construction of the Northern Pacific Railroad, it is obvious that they were excluded from the operation of the grant to the Oregon & California Company, unless (1) they are within the reservation contained in the grant to the Northern Pacific Company; or (2) the failure of that company to construct its road via the Columbia River valley, and to comply with the condition subsequent upon which the grant was made, operated to take the lands out of the reservation contained in the grant to the Oregon & California Company, whereby all "granted" lands were excepted therefrom.

It is urged by the defendants that the reservation contained in the grant to the Northern Pacific Railroad Company expressly excludes from that grant the lands in question in this suit. That grant was of "every alternate section of public land," etc., "not reserved, sold, granted," etc., "at the time the line of said road is definitely fixed and a plat thereof filed in the office of the commissioner of the general land office; and whenever prior to said time any of said sections or parts of sections shall have been granted * * * or otherwise disposed of, other lands shall be selected by said company in lieu thereof." The argument is that, inasmuch as prior to the time of fixing the definite line of the Northern Pacific Railroad a grant of the same lands was made to the Oregon & California Company, the lands fall within the description of "granted" lands, which are expressly excepted from the operation of the prior grant. In other words, while the lands in controversy were not "granted" lands at the time of the grant to the Northern Pacific Company, so as to be excluded from the lands conferred upon that company at that time, yet, within the time limited thereafter in which that company could establish its right thereto, they were withdrawn from that grant by the act of congress whereby they were bestowed upon another company, and that the contingency of such withdrawal and subsequent disposal was contemplated and provided for in the prior grant when the exception of granted lands was incorporated therein.

It is urged that there was no law to prohibit a second conditional grant of the same lands in aid of a second railroad before anything should have been done by the first company, and with the understanding that whatever should be taken by the second company should be in subordination to the rights of the first company. It may be conceded that the power of congress in this direction was plenary. But the question here is not what congress had the power to do. It is, what did congress do? What was the intention of congress in inserting the reservation of granted lands from the operation of the first grant? In the light afforded by the policy of the government in relation to the disposition of the public lands in aid of railroad construction, and in view of the settled doctrine of the courts in relation to the nature of the title which passes under such grants, it would seem that the reservation of "granted" lands was not made in contemplation of a subsequent bestowal of the lands in aid of another road. Under such a construction the object of the first grant would be liable to be wholly defeated by a second grant, and the beneficiary of any railroad grant, while complying strictly with the conditions imposed thereupon, might be deprived of the aid upon which the construction of its road depended.

In Missouri, etc., Ry. Co. v. Kansas Pac. Ry. Co., 97 U. S. 498, the reservation in the first grant was of lands which were not "sold, reserved or otherwise disposed of by the United States and to which a pre-emption or homestead claim had not attached at the time the line was definitely fixed." The court in construing the grant, speaking by Mr. Justice Field, said:

"As the sections mentioned could only be known when the route of the road was established, which might not be for years, the government did not intend to withhold the lands in the mean time from occupation and sale, and thus retard the settlement of the country, nor to exclude the land from appropriation for public uses. And the object of the reservation was to protect the acquisition of rights in this way to lands falling within the limits of the grant, and to exclude from its operation lands specially reserved and lands of a special character, such as mineral lands, other than those of iron or coal, the sale of which was seldom permitted anywhere, and swamp lands. The grant made was in the nature of a float, and the reservations excluded only specific tracts to which certain interests had attached before the grant had become definite, or which had been specially withheld from sale for public uses, and tracts having a peculiar character, such as swamp lands or mineral lands, the sale of which was then against the general policy of the government. It was not within its language or purpose to except from its operation any portion of the designated lands for the purpose of aiding in the construction of other roads."

In the recent case of St. Paul & P. R. Co. v. Northern Pac. R. Co., 139 U. S. 17, 11 Sup. Ct. Rep. 389, the court said:

"We are of opinion that the exception in the act making the grant to the Northern Pacific Railroad Company was not intended to cover other grants for the construction of roads of a similar character, for this would be to embody a provision which would often be repugnant to and defeat the grant itself."

But the grant to the Oregon & California Railroad Company contained a like reservation of "granted" lands, and it is next to

be considered whether the lands in controversy were so affected by the grant to the Northern Pacific Company that at the time the grant to the Oregon & California Company took effect they were "granted" lands, and were therefore not within the operation of the latter grant. The nature of the grant itself, and the title that passed thereunder, is well settled by numerous adjudications. In St. Paul & P. R. Co. v. Northern Pac. R. Co., 139 U. S. 5, 11 Sup. Ct. Rep. 389, Mr. Justice Field said, speaking for the court:

"As seen by the terms of the third section of the act, the grant is one in praesenti; that is, it purports to pass a present title to the lands designated by alternate sections. * * * The language of the statute is that 'there be and hereby is granted' to the company every alternate section of lands designated, which implies that the property itself passed not any special or limited interest in it. The words also import a transfer of a present title, not a promise to transfer one in the future. The route not being at the time determined, the grant was in the nature of a float, and the title did not attach to any specific sections until they were capable of identification, but when once identified the title attached to them, as of the date of the grant, except as to such sections as were specifically reserved."

The grant therefore conveyed a present title subject to be defeated upon a failure to comply with the conditions subsequent, but the right of re-entry was vested only in the grantor, the United States. The United States alone could declare a forfeiture.

The Northern Pacific road was never constructed via the Columbia River valley, or coterminous with these lands. On March 6, 1865, a map known as the "Perham Map," and intended by the company as a map of general route of the road, was forwarded to the secretary of the interior by the president of the company, together with a letter, in which the president said:

"Under authority of the board of directors of the Northern Pacific Railroad Company, I have designated on the accompanying map, in red ink, the general line of this railroad from a point on Lake Superior, in the state of Wisconsin, to a point on Puget sound, in Washington Territory, via the Columbia river, adopted by said company as the line of its railroad, subject only to such variations as may be found necessary after more specific surveys,"—and requested that "the lands granted to the company be withdrawn from sale in conformity with law."

The map was drawn in the manner indicated in the president's letter. The line intended for the main line followed the north bank of the Columbia river to a point at or near Portland, and thence to Tacoma, on Puget sound, where it was met by the branch line which crossed the Cascade mountains. The map was disapproved by the commissioner of the general land office, and his disapproval was affirmed by the secretary of the interior. The question of the effect of this map was before this court for adjudication on March 1, 1890, in the case of U. S. v. Northern Pac. R. Co., 41 Fed. Rep. 842; and it was held by Judge Sawyer that the company had the right, under the act of July 2, 1864, to locate its main line by way of the Columbia river through Portland, and that the Perham map was a map of general location, and that the failure of the secretary of the interior to give notice thereupon of the withdrawal of the lands from pre-emption, sale, etc., could not affect the rights of the company, for the act itself withdrew the lands upon the filing of the

map, or, as expressed in the act, "after the general route shall have been fixed," which was done by filing the map of the route selected.' The court said:

"The company, by filing the map, had indicated its line, and the grant, before uncertain, now became certain and attached to the odd sections of the land within the 40-mile limit. No notice was required to be given by the secretary;" citing Buttz v. Railroad Co., 119 U. S. 55, 7 Sup. Ct. Rep. 100.

It is urged that the decision loses its force as a precedent from the fact that the rejection of the Perham map by the commissioner of the land office and by the secretary of the interior was not brought to the attention of the court. It appears that the facts in regard to the Perham map were in that case agreed upon by the stipulation of the parties to the suit. It was stipulated that the map showed "the preliminary location of the company's railroad line from a point on Puget sound," etc., and that "no action was taken by the interior department upon the map, or the request accompanying it." I am unable to perceive how the action of the officers of the department could have affected the question that was then before the court. The matter under consideration was the action of the Northern Pacific Railroad Company, not what was done by the officers of the general land office. Their action could not affect the question that was then before the court, or the question that is now presented in this case.

The inquiry is whether or not the Northern Pacific Company fixed the line of its general route as early as March 6, 1865, by making and filing the Perham map. That the map, when filed, was unsatisfactory to the officers of the government, or was disapproved by them, is a matter foreign to the question. Whether or not it was a map sufficient for the purpose indicated must be determined by recourse to the map itself. The inquiry is not aided by reference to the action of the officers of the interior department. They were not clothed with power to prejudice the rights of the company. But, when their action is further considered, it appears that the extent of their disapproval was their refusal to withdraw the adjacent lands from settlement. This could not prevent the withdrawal, for, as said in the decision just quoted, the law itself made the withdrawal. The commissioner said:

"The evidence required of the route, under the established ruling of the department, is a connected map showing the exact location; the map indicating by flagstaffs the progress of the survey. * * * That proof is required to show the precise portions of each section or smallest legal subdivision cut by the road. * * * Now, in this view, the commissioner reports that no withdrawal should be ordered until the map of actual survey, authenticated as indicated, shall be filed in the district and general land offices."

It will thus be seen that in the estimation of the officers of the general land office the Perham map was insufficient, because it was not a map of the final and definite location of a surveyed road, and because it had not also been filed by the company in the district land offices in which the lands were situate, neither of which is required by the act.

In construing this act in Buttz v. Railroad Co., 119 U. S. 55, 7 Sup. Ct. Rep. 100, Mr. Justice Field said:

"The general route may be considered as fixed when its general course and direction are determined after an actual examination of the country. or from a knowledge of it, and is designated by a line on a map showing the general features of the adjacent country, and the places through or by which it will pass. * * * When the general route of the road is thus fixed in good faith, and information thereof given to the land department by filing the map thereof with the commissioner of the general land office, or the secretary of the interior, the law withdraws from sale or pre-emption the odd sections, to the extent of forty miles on each side."

It is contended further that the grant to the Northern Pacific Company of July 2, 1864, is wholly superseded and canceled by the joint resolution of congress of May 31, 1870, (16 Stat. 378,) and that whatever rights that company has in the public lands it takes from the latter date, having accepted the grant contained in the joint resolution in lieu of the earlier grant. I do not so understand the joint resolution. It begins with a recognition of the incorporation of the company under the prior act. It proceeds to confer upon the company power to mortgage its property. It expressly authorizes the company to make the change in its line by constructing the main line down the valley of the Columbia river, with power to build a branch line across the Cascade mountains, as indicated in the Perham map. It recognizes the existence and perpetuation of the prior land grant by providing for the substitution of other lands "in the event of there not being in any state or territory in which said main line or branch may be located, at the time of the final location thereof, the amount of lands granted by congress to said company within the limits prescribed by its charts." There is in the joint resolution other recognition of the "grants and duties" provided for in the act of incorporation, and nothing can be found indicative of a purpose to abrogate the prior act, or to substitute a new and independent grant therefor.

On the 13th day of August, 1870, the company filed a second map, designating the main line by way of the north bank of the Columbia river, as in the Perham map. It was a map of definite location, and thereupon the secretary of the interior formally withdrew the lands, and issued his notice. Whatever objection may be urged to the Perham map, it must be conceded that the map of August 13, 1870, in all respects, complied with the act, and that then, if not before, the line of the Northern Pacific road became definite and fixed. In the view I take of the law, it would make no difference with the rights of the parties to this suit if the Perham map had not been filed. The grant to the Northern Pacific being prior in date to the grant to the Oregon & California, and the reservation of granted lands from the first grant being held not to refer to lands subsequently granted in aid of another road, the first grant remained prior and superior to the second, and there could be no reversal of the order of their priority, resulting either from the fact that the grantee, under the junior grant, filed its map of definite location, and constructed a portion of its road, before any map was filed of the line of road under the older grant, or from the further fact that in the final construction of the Northern Pacific road no portion thereof was established upon the line either of the Perham map or the map of 1870. Congress did not offer these lands to the

v.57f.no.8—57

competition of the two companies, and it was not the intention that the more diligent of the two corporations should secure them.

I hold that the failure of the Northern Pacific to construct its road by way of the Columbia River valley, the forfeiture of its grant therefor declared by congress in 1890, and the construction by the Oregon & California Company of its road in apt time under its grant of July, 1866, are all matters foreign to the question under consideration. The fact remains that the lands in controversy were granted lands at the time the grant to the Oregon & California Company took effect. They were, therefore, not the subject of the grant to that company. When that grant was made the beneficiary thereof had full notice of the prior grant, and had reason to understand that the lands so devoted to aid the construction of the other road were not within the purview of its own grant, and were not promised it by the United States. Under these circumstances it cannot be justly said, as urged by counsel for the defendants, that the United States is now placed in the attitude of breaking faith with the Oregon & California Company. That patents were issued to the defendant company for these lands does not affect the decision of this case upon the demurrer. The public lands of the United States are held in trust for the people, and cannot be disposed of by the unauthorized acts of the agents or officers of the government. The demurrer to the bill must be overruled.