UNITED STATES v. ASH SHEEP CO.†

(Circuit Court of Appeals, Ninth Circuit.   March 8, 1915.)

No. 2434.

PUBLIC LANDS ⬤⟿4—CROW INDIAN LANDS—CESSION—GRAZING.

Under Act April 27, 1904, c. 1624, 33 Stat. 352, which modified the provisions of the treaty with the Crow Indians requiring the United States to buy the lands from the Indians at a specified price so as to provide that the Indians should cede their rights in such lands to the United States, which in return agreed to dispose of them in general conformity to the reclamation homestead, town-site, and mineral-land laws at a price not less than $4 an acre and to pay the proceeds to the Indians, and which expressly provided that the United States should not be bound to purchase any of the lands, except those granted to the state for school purposes, or to find purchasers therefor, it being the intent that it should act as trustee for said Indians to dispose of said lands and to expend and pay over the proceeds, the lands so ceded did not become public lands upon which the free grazing of sheep was permitted, but remained subject to the rules of the Secretary of the Interior governing grazing upon Indian lands.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 5; Dec. Dig. ⬤⟿4.]

Gilbert, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the District of Montana; George M. Bourquin, Judge.

Suit to enjoin trespass by the United States against the Ash Sheep Company.   Judgment for the defendant, and the United States appeals.   Reversed and remanded, with directions to enter judgment for the United States.

Burton K. Wheeler, U. S. Atty., of Butte, Mont., and Homer G. Murphy, Asst. U. S. Atty., of Helena, Mont., and Frank Woody, Jr., Asst. U. S. Atty., of Butte, Mont., for the United States.

C. B. Nolan and Wm. Scallon, both of Helena, Mont., for appellee.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

ROSS, Circuit Judge.   This suit was brought by the government (appellant here) to enjoin an alleged trespass by the appellee (defendant below) on certain described lands alleged to be a part of the Crow Indian Reservation in the state of Montana; the bill alleging, among other things, that the lands referred to are a part of the vacant ceded Indian lands of the Crow tribe of Indians, whose title to the same "has not been extinguished, and that said lands are subject to the rules and regulations made and promulgated by the Secretary of the Interior of the United States concerning Indian lands that have been opened for settlement and entry, dated November 27, 1911, and the act of Congress of the United States approved April 27, 1904 (33 Statutes at Large, page 352), entitled 'An act to ratify and amend an agreement with the Indians of the Crow Reservation in Montana, and making appropriations to carry the same into effect.'"

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

† Rehearing denied May 10, 1915.

The bill further alleges that about July 14, 1913, the defendant sheep company, in violation of the rules and regulations of the Secretary of the Interior, and of said act of Congress, grazed and caused to be grazed upon the lands in question and other vacant ceded Indian lands reserved for the use and benefit of the said Indians about 7,100 head of sheep, which are now trespassing thereon, the defendant company not having obtained authority therefor as provided by the rules and regulations of the Department of the Interior, or otherwise, and that the said defendant company threatens to continue to graze the said sheep on the said land and will do so unless restrained by the court, which acts constitute a continuing trespass, and will materially injure and destroy the use and value of the lands, and cause irreparable damage to the complainant and deprive the said Indians of the benefits to which they are entitled, by reason of which alleged unlawful acts the complainant and the said Indians are alleged to have been already damaged in the sum of $7,100.

The answer of the company, while expressly admitting the grazing of the sheep as alleged, and their threat and intention to continue such grazing, as well as the making and promulgation by the Secretary of the Interior of rules and regulations for the grazing of such lands as alleged in the complaint, set up that the lands in question were ceded to the United States by the said tribe of Indians, and have since constituted a portion of the public domain of the United States to which the said tribe of Indians have no claim, and that the said lands are not subject to the rules and regulations made and promulgated by the Secretary of the Interior in so far as they provide for the granting of permits for the grazing of such lands and for the payment of rentals therefor, and further alleged "that the lands in question were public lands of the United States, and that, pursuant to the policy of the government of the United States as to the free use of public lands for grazing and pasturage purposes, defendant, a citizen of the United States owning the sheep in question, asserted its right under that privilege and policy and grazed its sheep on said lands," and will continue so to do unless restrained therefrom; and denied that either the complainant or the Crow Indians have sustained or will sustain any damage by reason of the acts of the defendant company.

The cause coming on for hearing upon bill and answer, the court vacated the temporary restraining order that had been issued and gave judgment dismissing the suit, basing its action upon the view that the act of Congress which controls the case, and to which reference is now to be made, "incorporated the lands in the general mass of public lands, subject to all the incidents of the latter and to be likewise disposed of."

The act is that of April 27, 1904 (33 St. Lg. 352), entitled "An act to ratify and amend an agreement with the Indians of the Crow Reservation in Montana, and making appropriations to carry the same into effect." After reciting the making and concluding of an agreement with the Indians of the Crow Reservation by commissioners theretofore appointed on behalf of the United States, and setting out at large such agreement, the act declares, in its first section, among other things:

"That said agreement be, and the same is hereby, modified and amended to read as follows:

" 'Article 1. That the said Indians of the Crow Reservation do hereby cede, grant and relinquish to the United States all right, title and interest which they may have to the lands embraced within and bounded by the following described lines: Beginning at the northeast corner of the said Crow Indian Reservation; thence running due south to a point lying due east of the northeast corner of the Fort Custer Military Reservation; thence running due west to the northwest corner of said Fort Custer Military Reservation; thence due south to the southwest corner of said Fort Custer Military Reservation; thence due west to the intersection of the line between sections ten and eleven, township two south, range twenty-eight east of the principal meridian of Montana; thence due north to the intersection of the Montana base line; thence due west to the intersection of the western boundary of the Crow Indian Reservation; thence in a northeasterly direction, following the present boundary of said reservation to point of beginning.

" 'Art. 2. That in consideration of the land ceded, granted, relinquished, and conveyed by article one of this agreement the United States stipulates, and agrees to dispose of the same as hereinafter provided under the provisions of the reclamation act approved June seventeenth, nineteen hundred and two, the homestead, town-site, and mineral-land laws, except sections sixteen and thirty-six, or an equivalent of two sections in each township, at not less than four dollars per acre, subject to the provisions in section five, the United States to pay for sections sixteen and thirty-six, or an equivalent of two sections in each township, at one dollar and twenty-five cents per acre, and to pay the said Indians the proceeds derived from the sale of said lands, and for the said sections sixteen and thirty-six, or an equivalent of two sections in each township, as follows' " (setting forth various provisions in respect to payments, and other matters not necessary to be specifically mentioned).

## Sections 2, 5, and 8 of the act read:

"Sec. 2. That the said agreement be, and the same is hereby, accepted, ratified, and confirmed, as herein amended. * * *

"Sec. 5. That before any of the lands by this agreement ceded are opened to settlement or entry the Commissioner of Indian Affairs shall cause the allotments to be made and the schedule to be prepared, as provided for in section four of this act, and a duplicate of said schedule shall be filed with the Commissioner of the General Land Office. Upon the completion of such allotments and the filing of such schedule and after the sale or removal of such improvements, the residue of such ceded lands, except sections sixteen and thirty-six, or lands in lieu thereof, which shall be reserved for common school purposes, and are hereby granted to the state of Montana for such purpose, shall be subject to withdrawal and disposition under the reclamation Act of June seventeenth, nineteen hundred and two, so far as feasible irrigation projects may be found therein. The charges provided for by said reclamation act shall be in addition to the charge of four dollars per acre for the land, and shall be paid in annual installments as required under the reclamation act; and the amounts to be paid for the land shall be credited to the funds herein established for the benefit of the Crow Indians. If any lands in sections sixteen and thirty-six are included in an irrigation project under the reclamation act, the state of Montana may select in lieu thereof, as herein provided, other lands not included in any such project, in accordance with the provisions of existing law concerning school land selections. In any construction work upon the ceded lands performed directly by the United States under the reclamation act, preference shall be given to the employment of Crow Indians, or whites intermarried with them, so far as may be practicable: Provided, however, that if the lands withdrawn under the reclamation act are not disposed of within five years after the passage of this act, then all of said lands so withdrawn shall be disposed of as other lands provided for in this act. That the lands not withdrawn for irrigation under said reclamation act, which lands shall be determined under the direction of the Secretary of the Interior at the earliest practical date, shall be disposed of under the home-

stead, town-site, and mineral-land laws of the United States, and shall be opened to settlement and entry by proclamation of the President, which proclamation shall prescribe the manner in which these lands may be settled upon, occupied, and entered by persons entitled to make entry thereof; and no person shall be permitted to settle upon, occupy, or enter any of said lands, except as prescribed in such proclamation, until after the expiration of sixty days from the time when the same are opened to settlement and entry: Provided, that as to the lands open under such proclamation the rights of honorably discharged Union soldiers and sailors of the late Civil and the Spanish War or Philippine insurrection, as defined and described in sections twenty-three hundred and four and twenty-three hundred and five of the Revised Statutes, as amended by the act of March first, nineteen hundred and one, shall not be abridged: And provided further, that the price of said lands shall be four dollars per acre, when entered under the homestead laws, to be paid as follows:

"One dollar per acre when entry is made, and the remainder in four equal annual installments, the first to be paid at the end of the second year.

"In addition to the price to be paid for the land, the entryman shall pay the same fees and commissions at the time of commutation or final entry as now provided by law where the price of the land is one dollar and twenty-five cents per acre.

"Lands entered under the townsite and mineral land laws shall be paid for in amount and manner as provided by said laws, but in no event at a less price than that fixed herein for such lands, if entered under the homestead laws, and in case any entryman fails to make such deferred payments, or any of them, promptly when due, all rights in and to the land covered by his or her entry shall at once cease, and any payments theretofore made shall be forfeited, and the entry shall be held for cancellation and canceled: Provided, that the lands embraced within such canceled entry shall, after cancellation of such entry, be subject to entry under the provisions of the homestead law at four dollars per acre until otherwise directed by the President, as herein provided: And provided, that nothing in this Act shall prevent homestead settlers from commuting their entries under section twenty-three hundred and one, Revised Statutes, by paying for the land entered the price fixed herein, receiving credit for payments previously made, except as to lands entered under said reclamation act: And provided further, that when, in the judgment of the President, no more of the land herein ceded can be disposed of at said price, he may by proclamation, to be repeated at his discretion, sell from time to time the remaining land subject to the provisions of the homestead law or otherwise as he may deem most advantageous, at such price or prices, in such manner, upon such conditions, with such restrictions, and upon such terms as he may deem best for all the interests concerned. * * *

"Sec. 8. That nothing in this act contained shall in any manner bind the United States to purchase any portion of the land herein described, except sections sixteen and thirty-six or the equivalent in each township, or to dispose of said land except as provided herein, or to guarantee to find purchasers for said lands or any portion thereof, it being the intention of this act that the United States shall act as trustee for said Indians to dispose of said lands and to expend and pay over the proceeds received from the sale thereof only as received, as herein provided."

A reference to articles 1 and 2 of the treaty negotiated by the commissioners with the Indians, as set forth in the preamble to the foregoing act of Congress, shows that the treaty thus negotiated provided for the sale to the United States of all the right, title, and interest of the Indians in the lands in question for the sum of $1,150,000 to be paid by the government in certain prescribed ways; but Congress manifested its unwillingness to purchase the Indians' rights by modifying and amending the treaty as is shown in articles 1 and 2 of the first section of its act of April 27, 1904, by which it purchased only sec-

tions 16 and 36 of each township, or their equivalents, at $1.25 per acre, for the state of Montana, for school purposes, and in respect to all of the other lands by the treaty ceded, granted, and relinquished by the Indians to the United States, the government undertook to act only as trustee for the Indians in the mode and manner specifically set forth in the act in question. It is so expressly declared in the last section thereof, which reads:

"That nothing in this act contained shall in any manner bind the United States to purchase any portion of the land herein described, except sections sixteen and thirty-six or the equivalent in each township, or to dispose of said land except as provided herein, or to guarantee to find purchasers for said lands or any portion thereof, it being the intention of this act that the United States shall act as trustee for said Indians to dispose of said lands and to expend and pay over the proceeds received from the sale thereof only as received, as herein provided."

It is difficult to perceive how the purpose of Congress in the matter could have been more plainly stated.

With the exception of sections 16 and 36 or their equivalent, the United States expressly stipulated and agreed to dispose of the balance of the lands for the Indians at not less than $4 an acre, in general conformity, so far as feasible, with the Reclamation Act of June 17, 1902, c. 1093, 32 Stat. 388 (Comp. St. 1913, §§ 4700–4708), if disposed of within five years after the passage of the act of April 27, 1904; otherwise, to be disposed of as other lands provided for in the said act of April 27th, to wit, in general conformity with the homestead, town-site, and mineral-land laws. We say in "general conformity" with the laws just mentioned for the reason that, because of the special and specific provisions of the act under consideration, it is manifest that all of the provisions of neither the reclamation act, nor of the homestead, town-site, or mineral-land laws of the United States would be in all respects applicable to the specific Indian lands covered by the act of April 27, 1904.

This sufficiently appears from that portion of article 2 of section 1 of the act of April 27, 1904, providing that none of the lands thus ceded and relinquished by the Indians, other than the sixteenth and thirty-sixth sections, or their equivalents, shall be disposed of at less than $4 an acre, and shall be subject to the provisions contained in section 5 of the act, which provides that such of the said lands as may be disposed of under the reclamation act shall have $4 an acre therefor added to the charges provided for by the reclamation act, and that the amounts to be paid for such land "shall be credited to the funds herein established for the benefit of the Crow Indians"; and by the further provisions of section 5 of the act of April 27, 1904, that:

"The price of said lands shall be four dollars per acre, when entered under the homestead laws, to be paid as follows: One dollar per acre when entry is made, and the remainder in four equal annual installments, the first to be paid at the end of the second year. In addition to the price to be paid for the land, the entryman shall pay the same fees and commissions at the time of commutation or final entry as now provided by law where the price of the land is one dollar and twenty-five cents per acre."

And by the further provisions in section 5 of the act of April 27, 1904, that:

"Lands entered under the town-site and mineral-land laws shall be paid for in amount and manner as provided by said laws, but in no event at a less price than that fixed herein for such lands, if entered under the homestead laws, and in case any entryman fails to make such deferred payments, or any of them, promptly when due, all rights in and to the land covered by his or her entry shall at once cease, and any payments theretofore made shall be forfeited, and the entry shall be held for cancellation and canceled: Provided, that the lands embraced within such canceled entry shall, after cancellation of such entry, be subject to entry under the provisions of the homestead law at four dollars per acre until otherwise directed by the President, as herein provided: And provided, that nothing in this act shall prevent homestead settlers from commuting their entries under section twenty-three hundred and one, Revised Statutes, by paying for the land entered the price fixed herein, receiving credit for payments previously made, except as to lands entered under said reclamation act: And provided further, that when, in the judgment of the President, no more of the land herein ceded can be disposed of at said price, he may by proclamation, to be repeated at his discretion, sell from time to time the remaining land subject to the provisions of the homestead law or otherwise as he may deem most advantageous, at such price or prices, in such manner, upon such conditions, with such restrictions, and upon such terms as he may deem best for all the interest concerned."

We regard it as clear that such lands are not "public lands" subject to sale or other disposition under general laws (Newhall v. Sanger, 92 U. S. 761, 763, 23 L. Ed. 769), but are lands held by the United States as trustee for the Crow Indians, for disposal as provided by the act of Congress of April 27, 1904, amending and ratifying the agreement negotiated with those Indians by the commissioners theretofore duly appointed for the purpose.

It results that the judgment must be and hereby is reversed, and the cause remanded to the court below, with directions to enter judgment for the complainant for the injunction prayed for and for such damages as the court may find the complainant entitled to.

GILBERT, Circuit Judge (dissenting). The reversal of the judgment of the court below must necessarily rest upon the assumption that the lands in question are not public lands of the United States, but are still a part of the Crow Indian Reservation, and as such are subject to the control of the Bureau of Indian Affairs. Prior to the act of April 27, 1904 (33 Stat. 352), the United States had the legal title and the Indians had a right of occupancy in the lands. In Johnson v. McIntosh, 8 Wheat. 543, 5 L. Ed. 681, it was said:

The right of the Indians to their occupancy is as sacred as that of the United States to the fee, but it is only a right of occupancy. The possession, when abandoned by the Indians, attaches itself to the fee without further grant.

The act of April 27, 1904, extinguished the Indians' right of occupancy. After receiving from the Indians an absolute and unconditional cession of all their interest in the lands, thus adding the right of occupancy to the fee, is it the meaning of the act that the United States by a subsequent provision thereof intended to confer upon the Indians an equitable interest in the ceded lands?

The agreement between the United States and the Indians, as expressed in the act, provided, in article 1, "that the said Indians of the Crow Reservation do hereby cede, grant and relinquish to the United States all right, title and interest which they may have" to the lands in controversy. In article 2, in consideration of the agreement the United States stipulated and agreed to dispose of the lands. In section 8 it is declared that it is the "intention of this act that the United States shall act as trustee for said Indians to dispose of said lands and to expend and pay over the proceeds received from the sale thereof only as received, as herein provided." In the act it was further provided that the lands shall be disposed of under the homestead, townsite, and mineral-land laws of the United States and shall be open to settlement and entry by proclamation of the president. This provision, I submit, should be construed to mean that the United States undertakes to sell the lands and to hold the proceeds in trust for the Indians, and that the trust extends only to such proceeds, and that this construction should be given, not only on account of the language creating the trust, but also for the reason that the act opens the lands to settlement under the general land laws of the United States. As was said in United States v. Choctaw, etc., Indians, 179 U. S. 494, 536, 21 Sup. Ct. 149, 165 (45 L. Ed. 291):

"The declaration of a trust touching the money, and the failure to accompany the cession of the lands with any declaration of a trust in respect to them, manifestly shows that there was an intention to pass to the United States an absolute title to the lands."

The only decisions in which a trust has been declared in any treaty with the Indians are Minnesota v. Hitchcock, 185 U. S. 373, 22 Sup. Ct. 650. 46 L. Ed. 954, and United States v. Mille Lac Chippewa, 229 U. S. 498, 33 Sup. Ct. 811, 57 L. Ed. 1299, in which cases the court had under consideration the Act of January 14, 1889, c. 24, 25 Stat. 642. In both cases the court said that the cession was not to the United States absolutely, but in trust. In the Mille Lac Chippewa Case the court said:

"It was a cession of all of the unallotted lands. The trust was to be executed by the sale of the ceded lands and a deposit of the proceeds in the treasury of the United States to the credit of the Indians."

In that case the court held the United States answerable in damages for the reason that the lands had not been disposed of according to the terms of the act, but had been opened to settlement under the general land laws, not strictly for the benefit of the Indians, but in disregard of their rights and to the substantial diminution of the fund which would arrive from a disposition of the lands. In the act of January 14, 1889, so construed, the provision for a trust was the engagement of the United States to hold the proceeds of the land in trust for the benefit of the Indians. That act provided: First, for a complete cession and relinquishment of all title and interest of the Indians; second, for the survey of the lands; third, for a division into tracts of timber lands and agricultural lands, the former to be appraised and sold at the appraised prices, and the latter to be sold to actual settlers under the homestead law for $1.25 per acre; fourth,

for the deposit of the funds in the treasury of the United States for the benefit of the Indians. I submit that the meaning of the decision is that the trust extended only to the sale and the disposition of the proceeds thereof, and not to the title by which the United States held the lands. But, if indeed a trust was imposed upon the title itself, that case is to be distinguished from the case at bar, in that the lands ceded by the Crow Indians were made public lands of the United States, whereas by the treaty with the Mille Lac Chippewas the United States received no authority to deal with the lands as public lands, but was required to sell the same at fixed prices.

The very question here involved, the effect of the agreement with the Crow Indians, was passed upon by this court in Bean v. Morris, 159 Fed. 651, 86 C. C. A. 519. In that case we said:

"It is also urged that complainant's appropriation was invalid, because at the date of the initiation of his claim the headwaters of Sage creek were within the limits of the Crow Reservation in the state of Montana; that the complainant's appropriation conferred no right upon him as against the Indians of that reservation; and that appellants have succeeded to all rights of such Indians by their settlement upon the lands then occupied by such Indians. We think a complete answer to this contention is found in the opinion of the learned judge presiding in the Circuit Court, in which he said: 'When the right of the Indians was extinguished, and the land was thrown open to settlement, it became public.'"

In the opinion of the Circuit Court so referred to, Morris v. Bean, 146 Fed. 423, it was also said:

"When the right of occupancy ceased, the fee always having been in the United States, the lands became public by being thrown open to settlement, as the term was defined in Newhall v. Sanger."

On certiorari from the Supreme Court our decision was affirmed in Bean v. Morris, 221 U. S. 485, 31 Sup. Ct. 703, 55 L. Ed. 821, and while that court found it unnecessary to discuss the precise question of the status of the ceded Indian lands after the act of April 27, 1904, the decision must have been based upon the assumption that the lands became public lands by virtue of that act. The views of the court on that question must be taken to be comprehended in that portion of the opinion in which it was said:

"Other matters adverted to in argument, so far as not disposed of by what we have said, have been dealt with sufficiently in two courts. It is enough here to say that we are satisfied with their discussion and confine our own to the only matter that warranted a certiorari or suggested questions that might be grave."

Irrespective of any question of a trust created by the act of April 27, 1904, it is clear that all ceded lands of the Crow Indians were by that act and the subsequent proclamation of the President made public lands of the United States, and as such were opened to settlement and exploration. On May 24, 1906, the President by virtue of the power vested in him by the act declared and made known that all of the unallotted lands in the reservation except those which had been withdrawn for reclamation, those which had been reserved as subject to preference right of entry and the school lands "be opened to settlement, entry, and disposition under the general provisions of the homestead, town-site, and mineral-land laws of the United States."

Lands thrown open to settlement and exploration are no longer reserved lands. The lands were taken out of the category of Indian lands and were placed under the control of the Land Department, and the Bureau of Indian Affairs had no further control of the same. In Newhall v. Sanger, 92 U. S. 761, 23 L. Ed. 769, it was said that the words "public lands" are used to describe such lands as are subject to sale or other disposition under general laws. In order that lands be public lands it is unnecessary that they shall be open to settlement under all of the land laws of the United States. This court so held in United States v. Blendauer, 128 Fed. 910, 63 C. C. A. 636. It is inconsistent with the purpose of the act that settlement and exploration shall be barred or embarrassed by lessees of the Bureau of Indian Affairs, who are authorized under the regulations of that Bureau to fence, inclose, and improve the leased lands. As against such a lease, if valid, the settler or prospector is powerless to assert a right of access as upon public lands of the United States. I submit that the judgment should be affirmed.